**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| BLACK ELK ENERGY OFFSHORE | § | CASE NO. 15-34287 (MI) |
| OPERATIONS, LLC | § | |
| | § | |
| DEBTOR. | § | CHAPTER 11 |
| | § | |
| RICHARD SCHMIDT, LITIGATION TRUSTEE, | § | |
| | § | |
| PLAINTIFF, | § | |
| | § | |
| VS. | § | |
| | § | ADVERSARY NO. _____ |
| PLATINUM PARTNERS VALUE ARBITRAGE | § | |
| FUND LP, PLATINUM PARTNERS CREDIT | § | |
| OPPORTUNITIES MASTER FUND LP, PLATINUM | § | |
| PARTNERS LIQUID OPPORTUNITIES MASTER | § | |
| FUND LP, AND PPVA BLACK ELK (EQUITY) | § | |
| LLC, | § | |
| | § | |
| | § | |
| DEFENDANTS. | § | |
| | § | |

**ORIGINAL COMPLAINT**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

Richard Schmidt ("Trustee"), the Trustee of the Black Elk Litigation Trust ("Trust") files this Original Complaint against Platinum Partners Value Arbitrage Fund LP ("PPVAF"), Platinum Partners Credit Opportunities Master Fund LP ("PPCOMF"), Platinum Partners Liquid Opportunities Master Fund LP ("PPLOMF"), and PPVA Black Elk (Equity) LLC ("PPVA BE"), collectively "Platinum."

**I.**

**INTRODUCTORY DESCRIPTION OF THE CASE**

1.      The Trustee brings this adversary proceeding seeking to avoid and recover fraudulent transfers made by Black Elk Energy Offshore Operations, LLC ("Black Elk"), at the direction of Platinum, within two years before the date of the filing of Black Elk's involuntary bankruptcy petition.

2.      In 2009, Platinum invested in Black Elk, and that investment initially appeared very successful.  In 2011, the Wall Street Journal reported that, aided in part by the ban on drilling in the Gulf of Mexico after the BP Macondo explosion and oil spill, Platinum's Black Elk investment strategy "was Platinum's most successful last year, having contributed a significant portion of its high-teens return."

3.      On November 16, 2012, though, an explosion and fire occurred on an offshore Black Elk platform, and three workers died.  Because of that explosion and also deteriorating investment and market conditions, Black Elk's business began to suffer and decline.

4.      By early 2014, Black Elk was effectively insolvent – it was regularly pushing creditors' payments off to more than a year past their due dates because it simply did not have sufficient cash to pay its current liabilities.  Also by early 2014, Platinum dominated and controlled Black Elk -- being its majority and by far largest investor, controlling its credit facility, controlling the majority of the Senior Secured Notes and also junior Series E preferred equity, and appointing and controlling the Black Elk Board of Managers and Black Elk's chief Financial Officer ("CFO").  In early 2014, Platinum faced the prospect of losing more than $100 million in the impending demise of Black Elk.  To ameliorate that loss, Platinum devised several schemes to divert money to itself.

5.      Platinum's principal scheme involved selling off Black Elk's prime assets to Renaissance Offshore, LLC, and diverting the proceeds from that sale to Platinum by redeeming its junior Series E preferred equity instead of the Senior Secured Notes, including those held by Platinum, which were entitled to first call on the proceeds from the asset sale (the "Renaissance Sale").

6.      Platinum undertook this scheme so that Platinum could divert the Renaissance Sale money to itself to pay off its Series E preferred equity, thereby benefitting itself to the same extent as it would by paying off Senior Secured Notes - cash is cash - while at the same time maintaining its secured creditor position as a Holder of Senior Secured Notes at the head of the line to receive any assets from Black Elk's estate in the foreseeable bankruptcy.

7.      Thus, as Black Elk negotiated the sale of its prime assets to Renaissance, Platinum implemented a scheme to fraudulently claim that a majority of unaffiliated and disinterested Holders of the 13.75% Senior Secured Notes voted to allow Platinum the ability to transfer the proceeds of the Renaissance Sale to Platinum by redeeming the Series E preferred equity ahead of the Notes.

8.      The lynchpin in Platinum's fraudulent transfer scheme was to make it appear that a majority vote of unaffiliated and disinterested Senior Secured Note Holders consented to amend the Indenture.  Recognizing that it would be difficult to persuade truly unaffiliated and disinterested Secured Senior Note Holders to renounce their rights, Platinum had to find a way to fix the vote.

9.      The Indenture voting math is not complicated.  In 2010, Black Elk issued $150 million face value of the 13.75% Senior Secured Notes.  In order to permit the transfer of the Renaissance Sale proceeds to Platinum for the Series E preferred equity, rather than to the

3

Senior Secured Note Holders or to be used for trade payables or acquisitions necessary to maintain Black Elk as a going concern, Platinum had to minimize the number of tenders and secure approval of an amendment to the Indenture.  To secure that amendment, a majority of the unaffiliated and disinterested Holders of the Senior Secured Notes had to approve Platinum's proposal by consenting to the proposal.

10.     Specifically, as set forth in the Offer to Purchase and Consent Solicitation Statement: "Pursuant to Section 316(a) of the Trust Indenture Act of 1939, Notes owned by the Company or by any person directly or indirectly controlling or controlled by or under direct or indirect common control with the Company shall be disregarded for purposes of determining the majority."  (Ex. 1 at 18-19)[1]  Because Platinum controlled Black Elk, this statement meant that the sum of all Notes held by Platinum, Platinum-affiliated entities and entities controlled by Platinum were to be subtracted from the $150 million Notes entitled to vote.  Of the remainder, a majority had to consent.

11.     Since it was obvious that few truly unaffiliated and disinterested Senior Secured Note Holders would consent to the provision, Platinum had to find a way to ensure that a majority of the apparently unaffiliated and disinterested voters would consent to a proposal that was so contrary to their financial interest.  The most obvious way to secure that consent was to use a Trojan horse "friendly" consenter:  secure the votes of a company or companies holding a substantial number of Notes that looked independent, but were in fact controlled by Platinum.  That simple device was what Platinum used.

12.     The "friendly" consenters were a group of Beechwood entities, whose investment decisions were made and controlled by Platinum through Platinum's significant ownership

---

[1] The exhibits are not attached to this Complaint, but instead attached to the concurrently filed Declaration of Craig Smyser.

4

interests, by assigning a number of Platinum employees to Beechwood, and by installing a Platinum executive, David Levy, as the Chief Investment Officer ("CIO") of B Asset Manager, the investment arm of these Beechwood entities.  Levy remained an employee of Platinum while at Beechwood, or at least continued to use his Platinum email address while directing Beechwood, Platinum and Black Elk affairs in 2014, including involving himself constantly in the process that led to the fraudulent transfer of the Renaissance Sale proceeds to Platinum. After Levy was placed by Platinum at Beechwood, Levy directed the Beechwood entities in early 2014 to obtain at least $37 million of the Black Elk Senior Secured Notes.

13.    Platinum, through Levy, caused the Beechwood entities to vote to consent their Notes in favor of the Platinum proposal. Shortly after engineering Beechwood's purchase of the Senior Secured Notes and voting those Notes in favor of the Platinum scheme, Levy left his CIO position at Beechwood, and returned full time to Platinum.

14.    The manipulation of the Indenture vote and the subsequent fraudulent transfer of $98 million – virtually the entire remaining cash balance from Black Elk's Renaissance Sale – to Platinum all occurred less than two years before Black Elk filed for bankruptcy.

15.    In addition to the Renaissance Sale fraud, Platinum also made fraudulent transfers with respect to a Platinum-controlled credit facility company, White Elk, and also both appropriated a corporate opportunity and then later improperly transferred assets with respect to a company called Northstar Offshore Group, LLC ("Northstar") and later still improperly transferred assets to TKN Petroleum Offshore, LLC ("TKN Offshore").

16.    Platinum's scheming was known to some Black Elk executives from at least February 2014, but the schemes still succeeded.  Black Elk Chief Executive Officer ("CEO")

John Hoffman sent an email to Black Elk's General Counsel and one of its outside law firms on June 26, 2014 that described the schemes and predicted the result:

> I apologize for this note out of the blue but I need your guidance.  Platinum (PPVA) is planning to create many new companies and place the acquisitions [including Northstar] that Black Elk recently technically worked up, bid and won into those new entities.  Many if not all of existing equity holders would be left in the cold with no equity in the new companies.  Further, they plan to isolate Black Elk, pay themselves back ([Series E] preferred equity) ahead of so called friendly bond holders [the Beechwood entities] and lay off most people.  I believe that the ultimate plan is to bankrupt the company.

(Ex. 2)   Black Elk's CEO was right on all counts – Platinum appropriated the Northstar opportunity, did repay the Platinum Series E preferred equity rather than use the proceeds for trade payables or acquisitions, and even paid itself in front of the "friendly" voting Beechwood companies.  Platinum also later engaged in a fraudulent conveyance of Black Elk assets to Platinum-related TKN Offshore.  Black Elk's CEO was also correct in his June 26, 2014 prognostication -  once the Renaissance Sale proceeds went to Platinum for Platinum's Series E preferred equity, laying off employees and bankruptcy was not only inevitable, but also has occurred.

## II.
## JURISDICTION AND VENUE

17.     This Court has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334.  This is a core proceeding under 28 U.S.C.  § 157(b)(2)(A), (B), (C), (H) and (O).  Venue is proper in this Court pursuant to 28 U. S.C. §§ 1408 and 1409.  The statutory predicates for the relief requested herein are §§ 105, 502, 510, 544, 548 and 550 of the Bankruptcy Code.  In accordance with Local Rule 7008-1, the Trustee consents to the entry of final orders or judgment by the bankruptcy judge if it is determined that the bankruptcy judge, absent consent of the parties, cannot enter final orders or judgment consistent with Article III of the United States Constitution.

6

**III.**
**PARTIES**

18.     Trustee, Richard Schmidt, is the duly appointed Litigation Trustee in the above-caption chapter 11 bankruptcy proceeding of In re Black Elk Energy Offshore Operations, LLC, Bankruptcy Case no. 15-34287 ("Bankruptcy Case"), and has standing and authority to bring this action pursuant to his appointment as Litigation Trustee under the Plan [Docket Nos. 1092 and 1204].

19.     Defendant, Platinum Partners Value Arbitrage Fund LP, a Delaware limited partnership, has appeared in the above-referenced Bankruptcy Case and may be served through its counsel of record, Baker Botts L.L.P., Omar J. Alaniz and James R. Prince, 2001 Ross Avenue, Suite 600, Dallas, Texas 75201-2980 and Danny David, One Shell Plaza, 910 Louisiana Street, Houston, Texas 77002-4995.  Defendant may also be served by serving its registered agent for service of process, Vcorp Services, LLC, at 1013 Centre Road, Suite 403-B, Wilmington, Delaware 19805.

20.     Defendant, Platinum Partners Credit Opportunities Master Fund LP, a Delaware limited partnership, has appeared in the above-referenced Bankruptcy Case and may be served through its counsel of record, Baker Botts L.L.P., Omar J. Alaniz and James R. Prince, 2001 Ross Avenue, Suite 600, Dallas, Texas 75201-2980 and Danny David, One Shell Plaza, 910 Louisiana Street, Houston, Texas 77002-4995.  Defendant may also be served by serving its registered agent for service of process, Vcorp Services, LLC, at 1013 Centre Road, Suite 403-B, Wilmington, Delaware 19805.

21.     Defendant, Platinum Partners Liquid Opportunities Master Fund LP, a Delaware limited partnership, has appeared in the above-referenced Bankruptcy Case and may be served through its counsel of record, Baker Botts L.L.P., Omar J. Alaniz and James R. Prince,

594382.11

2001 Ross Avenue, Suite 600, Dallas, Texas 75201-2980 and Danny David, One Shell Plaza, 910 Louisiana Street, Houston, Texas 77002-4995.  Defendant may also be served by serving its registered agent for service of process, Vcorp Services, LLC, at 1013 Centre Road, Suite 403-B, Wilmington, Delaware 19805.

22.     Defendant, PPVA Black Elk (Equity) LLC, a Delaware limited liability company, has appeared in the above referenced Bankruptcy Case and may be served through its counsel of record, Baker Botts L.L.P., Omar J. Alaniz and James R. Prince, 2001 Ross Avenue, Suite 600, Dallas, Texas 75201-2980 and Danny David, One Shell Plaza, 910 Louisiana Street, Houston, Texas 77002-4995.  Defendant may also be served by serving its registered agent for service of process, Vcorp Services, LLC, at 1013 Centre Road, Suite 403-B, Wilmington, Delaware 19805.

**IV.**
**BACKGROUND**

**A.     Procedural Background**

23.     On August 11, 2015 (the "Petition Date"), three petitioning creditors' filed an involuntary bankruptcy petition against Black Elk under chapter 7 of title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy Court"), commencing an involuntary bankruptcy case.

24.     On August 31, 2015, Black Elk filed its Consent to the Order for Relief and filed its Motion to Convert the Involuntary Chapter 7 Case to a Voluntary Chapter 11 Case.  On September 1, 2015, the Bankruptcy Court entered the Order for Relief and entered an order granting Black Elk's Motion to Convert.

25.     The Black Elk initially operated its business as a debtor-in-possession pursuant to sections 1107 and 1008 of the Bankruptcy Code.

8

26.     On June 20, 2016, Black Elk filed its Third Amended Plan of Liquidation of Black Elk Energy Offshore Operations, LLC under Chapter 11 of the Bankruptcy Code (the "Plan") [Docket No. 1092].

27.     On July 14, 2016, the Bankruptcy Court entered an Order Confirming Third Amended Plan of Liquidation of Black Elk Energy Offshore Operations, LLC under Chapter 11 of the Bankruptcy Code [Docket No. 1204].

28.     Pursuant to the Plan, Richard Schmidt, Trustee herein, was appointed and approved to serve as the Litigation Trustee, with full authority to bring the above-captioned action.

**B.     Black Elk's History**

29.     Formed in November 2007 as a limited liability company, Black Elk was an oil and gas company headquartered in Houston with substantially all its producing assets located offshore in United States federal and Louisiana and Texas state waters in the Gulf of Mexico. (Ex. 3, at 1)   Black Elk acquired, exploited, and developed properties that other oil and gas companies had desired to remove from their producing property portfolios.  (*Id*.)  John Hoffman ("Hoffman") was a Black Elk founder and the company's CEO, and Anna Marizza Piche ("Piche") was the company's General Counsel.  Both were at Black Elk until August 2014.

30.     From 2008 to 2011, Black Elk employed an acquisition strategy to expand its holdings and further develop its business.  (*Id*., at 1-2)

31.     To finance its operations, on November 23, 2010, Black Elk issued $150 million of debt to the Senior Secured Noteholders, and simultaneously entered into, among other documents, a Security Agreement (the "Security Agreement") in favor of The Bank of New York Mellon Trust Company, N.A. ("BNY") as Trustee and Collateral Agent for the 13.75% Senior Secured Notes.  (Ex. 1, at 5; Ex. 92)  Pursuant to the Security Agreement, the Senior

Secured Noteholders were granted a first priority lien on substantially all of Black Elk's assets. (Ex. 1, at 54; Ex. 92)

32.     By December 31, 2013, Black Elk had approximately 457,065 gross (223,852 net) acres under lease in the Gulf of Mexico, 935 gross (444 net) wells and 58 production platforms. (Ex. 3, at 1)

33.     For 2014, Black Elk stated it intended to increase its reserves product and cash flow through several strategies.  (*Id*., at 2)  One strategy was to "continue to pursue strategic acquisitions."  (*Id*. at 2)  Black Elk would seek to acquire properties "currently producing or have the potential to produce with additional attention and capital" to "extend the economic life of fields."  (*Id*.)  The importance of this acquisition strategy could not be underestimated, as Black Elk told the SEC, because:  "If we are unable to replace reserves through drilling or acquisitions, our level of production and cash flows will be adversely affected."  (*Id*., at 22)

34.     Production and drilling on platforms in the Gulf of Mexico depended on the service of many independent contractors willing to work under those conditions.  In its 2013 10-K, Black Elk acknowledge its dependence on its contractors:  **"We are dependent on contractors and sub-contractors for our daily operational and service needs on individual fields and platforms.  If these parties fail to satisfy their obligations to us or if we are unable to maintain these relationships, our revenue, profitability and growth prospects could be adversely affected."**  (Ex. 3, at 25, emphasis in original)  Yet, despite this reliance on contractors, Black Elk said that "to increase liquidity, we stretched accounts payable."  (*Id*., at 26)  That meant Black Elk was not paying the contractors in a timely fashion for the work – "the daily operational service needs" – that were the lifeblood of its operations.  Thus, stretching accounts receivable threatened its core business, a fact Black Elk acknowledged:  "our inability

10

to pay trade creditors in a timely manner could impair our ability to develop and operate our properties." (*Id.*, at 26)

35.     Black Elk was effectively insolvent by early 2014 – some trade creditors were paid, if at all, more than a year past their due dates because Black Elk did not have sufficient cash to pay its liabilities. (Ex. 100)

## C.     Platinum's History

36.     Platinum Partners, LP is "a Manhattan hedge fund," that was founded in part by Murray Huberfeld, who is currently under criminal indictment.   (Ex. 72, at ¶ 8d; Ex. 73) Platinum Management (NY) LLC ("Platinum Mgmt") and Platinum Liquid Opportunity Management (NY) LLC are hedge fund sponsors.  They provide services to pooled investment vehicles. According to the Platinum Partners website, they launch and manage hedge funds for their clients, including the funds at issue in this case.  (Ex. 72, at ¶ 11)  They have listed Murray Huberfeld ("Huberfeld") as Partner, Mark Nordlicht ("Nordlicht") as a Managing Member and/or Chief Investment Officer, Uri Landesman ("Landesman") as President, and Daniel Small ("Small") as Managing Director.  (Exs. 27, 68 at 12, and 69)

37.     Platinum Mgmt is the manager for PPVAF, the core Platinum hedge fund, which was founded in 2003 by Nordlicht, with investors that also included Huberfeld.  (Ex. 68, at 12; Ex. 72, at ¶¶ 8, 11)  Nordlicht has been the Chief Investment Officer ("CIO") and the person primarily directing Platinum's day-to-day operations, as demonstrated by his signing, as "controlling person," a joint filing with the SEC on behalf of Platinum Mgmt, PPVAF, PPLOMF, and other Platinum-affiliated entities.  (*Id.*, at 12-13)

38.     A number of other Platinum executives have played key roles in the Platinum companies, like Black Elk, in which Platinum has invested, and then dominated and controlled. In addition to Nordlicht, Platinum's primary actors relevant to this case are: (a) David Levy

("Levy"), Huberfeld's nephew, a Managing Director and Portfolio Manager at Platinum, whom Platinum placed as CIO of the "friendly" Beechwood entities, and as the President of B Asset Manager, which was both the Administrative Agent for Black Elk's credit facility and also the investment arm of the Beechwood entities; (b) Daniel Small ("Small"), a Managing Director at Platinum Mgmt and Portfolio Manager at Platinum, an executive at Beechwood, and also placed by Platinum on the Black Elk Board of Managers; (c) Samuel Salfati ("Salfati"), who was an executive of Platinum that was placed on the Black Elk Board of Managers to secure a majority vote regarding the Renaissance Sale and the distribution of the proceeds to improperly repurchase Series E preferred equity.  Platinum also worked through Black Elk's Chief Financial Officer, (d) Jeff Shulse ("Shulse"), whom Platinum placed at Black Elk in January 2014, and also through (e) Steven Fuerst ("Fuerst"), whom Platinum placed at Black Elk and who became Black Elk's General Counsel in August 2014.

## V.
## PLATINUM'S PLUNDER OF BLACK ELK

**A.  Platinum's Dominion and Control through Black Elk's Credit Facility; Transfers to Platinum Cayman and White Elk**

39.     On December 24, 2010, Black Elk entered into a $200 million, two-part credit facility with Capital One as the administrative agent (the "Credit Facility").  The Credit Facility consisted of a senior secured revolving loan (the "Revolving Credit Facility") and a secured letter of credit facility (the "Letter of Credit Facility").

40.     On August 30, 2013 Black Elk consented to Capital One (and its syndicated lenders) assigning the Revolving Credit Facility to a lending syndicate with White Elk LLC as lender and administrative agent and a company called Resource Value Group ("RVG") as lender through a Loan Purchase and Sale Agreement.  White Elk and RVG are Platinum-related entities created just days before the assignment for the purpose of assuming control over Black Elk's

Credit Facility.  At the time of the loan assignment, Black Elk had drawn about $60 million from its revolving line of credit with Capital One.  Since the date of the loan assignment, there is no record of Black Elk receiving any additional sums from the newly created lending syndicate.

41.    RVG was formed just 16 days before the loan assignment, on August 14, 2013, and is identified as an affiliate of Platinum in Black Elk SEC filings.  Further, a September 2013 Put Agreement entered into between RVG and PPVAF was signed by Managing Director, Daniel Small, on behalf of both Platinum and RVG.  (Ex. 65)  Through Lender Joinder Agreements, RVG assigned its right to payment under the loan purchase agreement to various parties.

42.    White Elk was formed just 3 days before the loan assignment, on August 27, 2013.  On at least one occasion, Black Elk transferred funds directly to a Platinum entity after identifying the recipient of funds in its accounting records as White Elk.  The details of that transfer are provided below:



(Ex. 66)

43.    Significantly, White Elk received numerous wire transfers from Black Elk at the specific instruction of Platinum, and without regard to priority or basis for such transfers.  A log of transfers to White Elk from Black Elk's Operating Account in the two years prior to the Petition Date is provided below:



(*Id*.)

44.    In connection with its credit facility interest, and as detailed above, White Elk received at least eleven (11) million dollars directly from Black Elk.

45.    The loan purchase agreement, lender joinder agreements and other documentation were designed to create the impression that the foregoing entities were simply assigned Capital One's rights (i.e., repayment of principal and interest) related to funds received by Black Elk under the original revolving line of credit.  On information and belief, ultimately, however, Black Elk paid the foregoing entities sums in excess of what was owed under the terms of the Revolving Credit Facility at the time of its assignment to a Platinum affiliate.

**B.    Platinum's Dominion and Control through Platinum's Equity Position; the Renaissance Sale and Transfers to Benefit Platinum**

46.    **Platinum's domination and control of Black Elk's equity position.**  In the first quarter of 2013, Black Elk entered into contribution agreements with PPVA BE and Platinum Partners Black Elk Opportunities Fund LLC ("PPBE") or entities designated by PPBE (together, the "Platinum Group") pursuant to which Black Elk issued 50 million additional Series E

14

preferred equity units and 3.8 million additional Class B Units to the Platinum Group for an aggregate offering price of $50 million.  (Ex. 3, at 43)  In addition, Black Elk also agreed to issue an additional 43 million Series  E preferred equity units in exchange for $30 million of outstanding Series D preferred equity units and $13 million of paid-in-kind dividends.  (*Id.*)

47.     On February 12, 2013, Black Elk entered into an agreement with Platinum under which Black Elk agreed to issue Class B Units to Platinum in exchange for financial consulting services.  (*Id*., at 56)  Consequently, Black Elk issued 1,131,458.5 Class B Units to PPVA BE, an affiliate of Platinum, pursuant to such agreement.  (*Id.*)

48.     As of December 31, 2013, Platinum owned approximately 85% of Black Elk's outstanding voting membership interests and approximately 66% of Black Elk's total outstanding membership interests, giving it significant influence and control in corporate transactions and other matters.  (Ex. 3, at 33)  As a result of its majority ownership interest in Black Elk, Platinum had the ability to and did exercise its rights to remove and appoint key personnel, including all Managers, and to determine and control the company, management policies, financing arrangements, the payment of dividends or other distributions, and the outcome of certain company transactions or other matters submitted to members for approval, including potential mergers or acquisitions, asset sales and other significant corporate transactions.  (*Id*.)  Corporate documents, including Black Elk's Operating Agreement, which refers to the role of a "Platinum Manager," and e-mail communications referenced herein reveal overwhelming evidence of Black Elk management conferring with, and seeking approvals from Platinum for day-to-day business decisions, as well as any significant or extraordinary transactions.  (Ex. 98, at 18-19)

49.    Prior to the Petition Date, Platinum had the ability to appoint members of the Black Elk's Board of Managers, who in turn, had the power to appoint and remove Black Elk's Officers.  (Ex. 3, at 33)  Through this influence, Platinum has dominated Black Elk, exerting control over the Black Elk's day-to-day operations.  In fact, Black Elk's former Chief Executive Officer and several other Black Elk employees have stated that Platinum actively participated in and directed the affairs and operations of the Black Elk.  (Ex. 4, at 17; Ex. 53)  Platinum's control over Black Elk includes, among other indicia of domination, Platinum having directed Black Elk to engage in specific business transactions, causing Black Elk to terminate existing business relationships in favor of entities related to or affiliated with Platinum, and controlling which of Black Elk's vendors were paid (if at all) and when.  Platinum used this domination of Black Elk inequitably and to the detriment of Black Elk and Black Elk's creditors by, among other actions, preventing Black Elk from paying is legitimate debts while diverting assets to the benefit of Platinum and its affiliates and insiders.

50.    Platinum consolidated and further exerted its control over Black Elk, and stepped up the implementation of its schemes to plunder Black Elk, when it appointed Jeff Shulse as Black Elk's CFO in January 2014.  As described by Black Elk's founder and former CEO Hoffman, "Mr. Nordlicht and Mr. Small came into my office and made a very hard sell to put Jeff Shulse into the CFO position."[2]  (Ex. 4, at 21)  As Hoffman further testified, "Jeff [Shulse] was not a team player and he was clearly there working for Platinum."  (*Id*., at 110)  Beginning in January 2014, "it was almost weekly we would either see Small, Levy or Nordlicht in the [Black Elk] office."  (*Id*., at 74)  Hoffman has further testified that "Platinum was calling all of

---

[2] A new CFO was needed at Black Elk because, as Black Elk's CEO told Nordlicht, Small and Levy in a January 7, 2014 email responding to a Nordlicht email about strategies and a message "to hold off [Black Elk's] bondholders":  "FYI – Bruce has stopped coming in.  He doesn't want to be CFO with all the stuff going on."  (Ex. 67)

the financial shots.  I would say as of February [2014], they were in complete control of, you know, essentially almost every daily activity and most certainly stayed on top of every penny in and every penny out."  (*Id.*, at 17)  Also according to Hoffman, Platinum had the ultimate decision-making authority on whether Black Elk would enter into an acquisition or buy any properties.  (*Id.*, at 48)

51.     Shulse clearly worked for the benefit of Platinum, and not Black Elk.   On March 7, 2014, a couple of months after Platinum installed Shulse as Black Elk's CFO, Shulse sent an email to David Levy regarding "████████████████████"  (Ex. 5)  In this email, Shulse stated that Levy, on behalf of Platinum, was "███████████████████████████████

████████████████████."  (*Id.*)  Shulse went on to say that "███████████████████

████████████████████████████████████████

████████████████████████"  (*Id.*)

52.     By July 22, 2014, when Shulse still had not finalized his equity deal with Platinum, he sent Daniel Small an email pledging that "████████████████████████

████████████████████████"  (Ex. 5)  Shulse went on to remind Small that "██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████"  (*Id.*, emphasis added)

53.     This July 2014 email also attached the undated text of an earlier email from Shulse to Levy, where Shulse reaffirmed that "█████████████████████████

████████████████████████"  (Ex. 5)  Shulse restarted the discussion of his equity interest by first stating that "███████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████ "

(*Id.*)  After concluding his lengthy list of proposed terms, Shulse reminded Platinum that " ████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████ "  (*Id.*)  Shulse concluded this email with the following:  " ████

████████████████████████████████████████████████████████████

████████████████████████████████████████ "  (*Id.*)

54.     As Shulse and the other Platinum plants at Black Elk knew by July 2014, Black

Elk "did not have enough income to pay all of the bills that were outstanding" (Ex. 4, at 91;

Ex. 100), and thus was unable to pay its debts as they became due.  (Ex. 6, Note 2—Going

Concern Consideration)  Black Elk did not have the funds or liquidity to pay its mounting trade

debt, which is believed to have been in the $80 to $90 million range.[3]  (*Id.*; Ex.  4, at 81-82, 91)

Black Elk was financially stressed to the point where the only short-term alternative to filing a

bankruptcy was to sell substantially all of its assets.

55.     **The Renaissance Sale.**  On or about July 10, 2014, Black Elk entered into a

Purchase Sale Agreement with Renaissance Offshore, LLC (the "Renaissance Sale") that would

_____

[3] Fuerst, as the person brought in by Platinum in 2013 "to be the center point person for the
vendors to call…." (Ex. 4, at 84), and also later as General Counsel, was well aware of Black
Elk's financial condition and inability to continue if the proceeds of the Renaissance sale went to
pay off Series E Platinum preferred debt.

18

transfer certain assets to Renaissance in exchange for $170 million, subject to certain closing adjustments.[4]  (Ex. 7, Section 2.1)  The Renaissance Sale represented "a significant amount of [Black Elk's] cash flow, proved reserves, and production."  (Ex. 6, at 6, Note 5—Acquisitions and Divestitures)  The Renaissance Sale closed on August 15, 2014, at which time about $125 million in proceeds was transferred to Black Elk.  (*Id.*, at 6; Ex. 8)

56.     Rather than use these Renaissance Sale proceeds to pay Black Elk's substantial debts, the Senior Secured Notes or trade payables, Platinum used the proceeds to retire Black Elk's Series E preferred equity units, which not only provided no real value to Black Elk, but also cemented Black Elk's insolvency and avoided the proper order of priority.  (Ex 6, Note 9, Members' Deficit)

57.     Because of its ownership and control of Black Elk, Platinum, through an improper Offer to Purchase and Consent Solicitation, purported to amend the Indenture to allow the vast majority of the Renaissance proceeds to be used to retire the Series E preferred equity and to purchase only a small number of the Senior Secured Notes.  (Ex. 6, at 10, Note 8—Debt and Notes Payable, at 11, Note 9—Members' Deficit)

58.     **The Offer to Purchase and Consent Solicitation Scheme.**  The Offer to Purchase and Consent Solicitation required a majority of the non-Platinum-affiliated Secured Senior Note holders to consent.  Platinum, through primarily Nordlicht, Small, and Levy, caused the following representation to appear in the Offer to Purchase and Consent Solicitation Statement:  "As of the date hereof [July 16, 2014], there are $150 million aggregate principal amount of Notes issued and outstanding under the Indenture.  Platinum Partners Value Arbitrage

---

[4] Although Black Elk was the party on the Renaissance PSA, Platinum was representing in an E&P Ventures PowerPoint that "████████████████████████████████████████," (Ex. 70, at 5)

Fund L.P. and its affiliates, which own approximately 85% of our outstanding voting membership interests,[5] own approximately $18,321,000 principal amount of outstanding Notes. Otherwise, neither we, nor any person directly or indirectly controlled by or under direct or indirect common control with us, nor, to our knowledge, any person directly or indirectly controlling us, held any Notes."  (Ex. 1, at 5)  This last sentence was false, and designed to cover up Platinum's scheme to fix the consent vote.

59.    Platinum's actual purpose was (1) to avoid having a large number of Notes tendered, but (2) to allow Platinum to receive the benefit of approximately $98 million from retiring Series E preferred equity in disregard of the proper priority order of distribution. (Ex. 92)  By avoiding tender of any significant amount of Senior Secured Notes, Platinum maximized the amount of cash available for retiring the Series E preferred equity, while also maintaining the priority position of Platinum's own Senior Secured Notes.

60.    The first purpose of discouraging a large number of tenders was achieved primarily by the unpalatable terms of the Offer to Purchase and Consent Solicitation, which provided no redemption premium on tendered Notes.  Platinum accomplished the first part of its goal, as only 11,433,000 of the 150,000,000 Notes, or 7.62%, were tendered.  (Ex. 39)  Platinum tendered none of its own Notes.

61.    Platinum achieved the second part of its goal, allowing an improper priority redemption of its Series E preferred equity, through a scheme to fix the vote.  In the months leading up to the Offer to Purchase and Consent Solicitation, Platinum orchestrated the scheme explained by Nordlicht in a February 4, 2014 email to Black Elk's CEO Hoffman and CFO

_____

[5] As of June 2014, Platinum was the majority holder of Series E preferred equity.  Schedules obtained from Black Elk's auditors indicate Platinum held more than 80 million Series E preferred equity compared to the roughly 20 million held by other parties.  (Ex. 9; Ex. 10, Attachment B)

Shulse, and Platinum's Small, Levy, and David Ottensoser: "the move is going to be to inform bondholders we have sales lined up but we are going to use the proceeds for working capital and for drilling.  That will lead to friendlies getting control of bonds at decent prices.  Once friendlies have control of bonds, we can then execute with flexibility according to what we would like to do."  (Ex. 71)

62.     Nordlicht further updated Black Elk's CEO Hoffman and General Counsel Piche, in a February 6, 2014 email: "FYI – I am close to buying 20 million bonds from MSD.  It will at that point be easy task to buy additional 25 million if bondholders don't behave and we can change covenants at any time by flipping our bonds to friendlies . . . ."  (Ex. 11)

63.     By March 3, 2014, Platinum's Nordlicht informed Levy, Shulse, Hoffman, and Piche that "We have friendly buying 20 million" (Ex. 12) and further assured this same group by email that Platinum would soon have "50 percent in friendly hands,"[6] in which case the vote would be "academic."   (*Id*.)   Hoffman also was informed by Platinum on "a number of occasions[,] don't worry about the bond vote, you know.  We [Platinum] have control of the vote."  (Ex. 4, at 94)  Hoffman specifically identified Platinum, Shulse and Fuerst as the people "aligned about the [Renaissance] money going to buy the Series E."   (*Id*., at 100)  This scheme, of course, was not revealed to the Senior Secured Note holders that were unaffiliated with Platinum.[7]

---

[6] Having a majority also was perceived as beneficial to Platinum because Nordlicht believed that "50 percent can override them" if "25% of the bondholders[ ] call a default."  (Ex. 13)

[7] In fact, Shulse and Platinum were telling the marketplace exactly the opposite.  In a July 17, 2014 email, JAB Energy confirmed its conversation with Shulse that "BEE will use the proceeds to pay down current bond holders, pay down payables, and return some preferred equity to Platinum."  The email said that "[p]er our conversation, BEE intends to make current all of the AOS payables app $2.8 million, make a large payment to JAB of between $4 and $6 million and return to the executed payment plan between BEE and JAB for outstanding balance."  (Ex. 14) Shulse and Platinum were falsely claiming that bondholders would be paid first, then payables

64.     Platinum, at the primary direction of Nordlicht, Levy, and Small,[8] obtained alleged approval of the indenture amendments in part through an improper Platinum "disclaimer of beneficial interest" in $43,293,000 of Notes that were in fact beneficially owned by Platinum affiliates.  (Ex. 15; Ex. 10, Attachments C and E)

65.     Platinum also achieved the improper consent approval in part through implementation of the scheme to have "friendly" Notes bought and held by the affiliated but undisclosed Beechwood entities voted in favor of consent.  Platinum, Nordlicht, Levy and Small were the primary architects that implemented this scheme.  As revealed in a September 17, 2016 *Wall Street Journal* article, Beechwood was owned in substantial part by Platinum and its affiliates – Platinum (through Nordlicht and Murray Huberfeld) controlled over 35% of Beechwood, and Levy (and his family trusts) controlled another 5%.  (Ex. 17, ¶ 68; Ex. 74) Platinum, including Nordlicht and Levy, formed Beechwood with two other people acting as front men for the purpose of entering into reinsurance agreements in which they would be able to control and use trust assets to benefit Platinum and themselves.  Platinum exercised dominance and control of Beechwood.

66.     In order to implement the scheme to have "friendlies" purchase and vote the Notes as directed by Platinum, Platinum installed Levy as the Chief Investment Officer and

---

would be paid second, and finally some preferred equity to Platinum would be paid third.  The actual intent was to make sure that Platinum got paid for its Series E preferred equity while maintaining its Note priority position.

[8] By examples, the Second Supplemental Indenture required and had the signatures of Hoffman as CEO and a Manager, Fuerst as the Secretary and General Counsel, and Small and Salfati as Managers.  Shulse, as CFO, made the false representation in the Officers' Certificate that "The undersigned confirm that, excluding any Notes held by the Permitted Holders, the Issuers, or any Guarantor, or by an Person directly or indirectly controlling or controlled by or under direct or indirect common control with the Permitted Holders, the Issuers, or any Guarantor, the holders of a majority in the aggregate of principal amount of the Notes outstanding have consented to the Second Supplemental Indenture."  (Ex. 16)

President at B Asset Manager, the investment arm of the Beechwood entities. At the same time, Levy continued to work for and on behalf of Platinum with respect to Black Elk.[9] Levy, on behalf of Platinum, began making the investment decisions for Beechwood. (Ex. 17, ¶ 86; Ex. 74)

67.     As Chief Investment Officer and President of B Asset Manager, Levy caused the "friendly" Beechwood entities Beechwood Bermuda International Ltd., BBIL ULICO 2014, Bre WNIC 2013 LTC Primary, Bre WNIC 2013 LTC Sub, and Bre BCLIC to obtain approximately $37 million worth of Notes, and then vote them as directed by Platinum and in support of Platinum's scheme.[10] (Ex. 17, ¶¶ 93-95; Ex. 21, at PPVA-10468 (Schedule 1, listing number of Notes held by Beechwood entities); Ex. 22 (Bond Spreadsheet); and Ex. 28 (BNY Mellon Chart)) As Reuters has reported, "Beechwood spokesman David Goldin confirmed that Levy was responsible for Beechwood's purchase of Black Elk bonds and for voting them in Platinum's favor, along with the approval of the covenant changes." (Ex. 29)[11] As set forth in another

---

[9] Levy, for example, on behalf of Platinum, but while at B Asset Manager / Beechwood and using his dlevy@beechwood.com email, addressed the internal senior management disputes at Black Elk among Black Elk Officers Shulse, Hoffman, and Art Garza on July 13, 2014, 3 days before the Black Elk 8-K announcing the Offer to Purchase and Consent Solicitation. (Ex. 18) Upon information and belief, Beechwood also has had a number of other Platinum plants over the pertinent time period, including Will Slota, at Chief Operating Officer, Paul Poteat, as Chief Technology Officer, David Ottensoser, as General Counsel, Daniel Small, as Senior Secured Collateralized Loans Project Manager, David Leff, as United States Fixed Income Project Manager, Rick Hogdon, as Chief Underwriting Officer, Daniel Saks, as B Asset Manager's Chief Investment Officer (after Levy resigned and returned full-time to Platinum), and Naftali Manela and Eli Rakower, who provided consulting services to Beechwood. (Ex. 17, ¶¶ 104, 64, 17; Ex. 74)

[10] Also in February 2014, with David Levy acting as President of B Asset Manager, the Beechwood entities entered into a Loan Purchase and Sale Agreement, as well as ancillary agreements, related to Black Elk's Credit Facility. (Ex. 23; Ex. 24, Omnibus Assignment; Ex. 25, Note; Ex. 26, Note)

[11] Platinum's effective control of the Beechwood Notes also is illustrated in the email communications among Platinum executives on May 16, 2014 regarding Platinum lending out and getting back Black Elk Notes from B Asset Manager. (Ex. 30)

complaint recently filed against Levy, among others, in the Southern District of New York: "In short, Beechwood, in the person of Levy, voted Beechwood-purchased bonds [and did not tender their Notes], including the Trust's bonds, against the interests of the Trust and Beechwood, and in favor of subordinating them to Platinum's interests, even though the vote meant that the Trusts' bonds would be exposed to greater risk of loss, because all the value of Black Elk's assets was paid to Platinum."  (Ex. 17, ¶ 95)

68.    In addition to the improper rigging of the vote through "disclaiming" affiliates and obtaining "friendly" votes, Platinum also obtained any truly non-affiliated consent by misstatements of fact, including (a) not disclosing the amount of Notes disclaimed by Platinum, (b) the relationships between the consenting parties and Platinum, and (c) Platinum's intentions to cause Black Elk to repurchase all of Platinum's Series E preferred equity, and the effect that such repurchase would have on the ability of Black Elk to continue as a going concern.

69.    Black Elk's founder and then-CEO Hoffman was sufficiently troubled by Platinum's undisclosed plan to repay itself ahead of Black Elk's lenders and creditors that he emailed Black Elk's General Counsel Piche and outside counsel on June 26, 2014, stating in part his understanding that "they [Platinum] plan to isolate Black Elk, pay themselves back ([Series E] preferred equity) ahead of so called friendly bond holders and lay off most people."  (Ex. 2)

70.    Hoffman also issued a memorandum on July 9, 2014 revoking all Black Elk's employees' authority with respect to all contracts and monetary matters.  (Ex 31; Ex. 4, at 134) Hoffman's memorandum, which stated that his approval and signature was required for, among other things, all wires, checks or other transfers of Black Elk's property, was apparently his attempt to prevent Platinum from carrying out its plan to recover its equity investment at the expense of Black Elk's lenders and creditors.  (Ex. 31; Ex. 32)

71.     Also on July 9, after sending out his memorandum, Hoffman had an email exchange with Nordlicht in which Hoffman recognized that Black Elk was now being run by Platinum through Shulse and protested that "█████████████████████████████████ ████████." (Ex. 32)  Hoffman went on to say that "████████████████████████████████ █████████████████████████████████████" and that "████████████████████████████ █████████████████████████████████."[12]   (*Id.*)   Hoffman recognized that "████████████████████████████████████████████████████████████ ████████████████████████████████████."   (*Id.*)   Hoffman feared that Platinum's interest was in "shutting down Black Elk and taking all the money out."  (Ex. 4, at 76)



72.     Hoffman, as CEO, also had directed the termination of Shulse, the CFO.  On July 13, Levy, emailing Hoffman from his Beechwood address, directed:  "As we discussed please pull back the letter [of termination] on Jeff [Shulse]."  (Ex. 33)  Hoffman forwarded this email to Piche, Black Elk's General Counsel, stating:  "See note from Platinum usurping my decision to fire the CFO."  (*Id.*)  Shulse continued to work on Platinum's behalf at Black Elk.

73.     The purported July 14, 2014 Written Unanimous Consent of the Managers of Black Elk regarding the Renaissance Sale and the Offer to Purchase and Consent Solicitation contains the signature of Platinum's Small, but not Hoffman.  (Ex. 75)

74.     As noted above, at the time of the Renaissance Sale, Platinum exercised control over Black Elk.  Platinum now held the vast majority of the common stock in Black Elk, as well

---

[12] These sentiments are consistent with Hoffman's statement in a June 27 email to Nordlicht that "[t]he current direction runs counter to my instincts.  I have fiduciary duties and no longer feel that I have the capacity to exercise those duties."  In that same email, Hoffman said that "I am apprehensive about the uses of the Renaissance proceeds as I feel it will put Black Elk at risk of defaulting on creditors and ruin my reputation."  (Ex. 34)

as a significant portion of Black Elk's 13.75% Senior Secured Notes, Senior Secured Revolving Credit (through its common ownership of White Elk and RVG) and Series E preferred equity units.  (Ex. 6, at 11-12, Note 9, at 20, Capital Contributions; Ex. 35 ("PPVA is directing our current strategic business activities . . . ."))

75.    On July 16, 2014, Black Elk filed a Form 8-K with the Securities and Exchange Commission (the "SEC') announcing that it had made a tender offer to, and solicited consent from, holders of its 13.75% Senior Secured Notes that, among other things, allowed noteholders to tender their notes and sought to change certain covenants that would enable Black Elk to retire Series E preferred equity ahead of the Notes.  (Ex. 36)

76.    Platinum dominated and controlled the Renaissance Sale closing, as well as the Offer to Purchase and Consent Solicitation.  On August 12, 2014, Daniel Small, on behalf of Platinum, emailed David Levy at dlevy@beechwood.com to ask whether he has "signed the releases for the [Renaissance] sale?"  (Ex. 37)  Levy responded one minute later from his iPad, "No what do I need to do !"  At 10:49 pm, Small then instructed Levy:  "David, sign the attached document and forward it to Russell Diamond for counter-signature and copy Jeff [Shulse at Black Elk]."  (*Id.*)  Small then further instructed Shulse:  "Jeff, concurrent with David sending to Russell send Russell the NSAI reserve report excluding the properties sold to Renaissance so he can calculate the hedges that need to be unwind [sic]."  (*Id.*)  The next day, August 13, 2014, Levy, as President of B Asset Manager LP, executed and provided consent for the Renaissance Sale. (Ex. 38)

77.    On August 14, 2014, Black Elk, under the influence of Platinum, issued a press release falsely claiming that "holders of $110,565,000 principal amount of the Notes, or 73.71% of the Notes, had validly consented to the Consent Solicitation and not revoked such consent."

(Ex. 39; Ex. 28)   Any questions were to be directed to Fuerst. These alleged results were achieved only by improperly including all of the Platinum controlled, but "deemed not affiliated" and "friendly" votes.[13]

78.     On August 15, 2014, Black Elk issued a Form 8-K announcing that it had received consent from holders of its 13.75% Senior Secured Notes to, among other things, apply the proceeds from the Renaissance Sale to retire the tendered 13.75% Senior Secured Notes and to utilize the remaining proceeds to re-purchase preferred equity issued by Black Elk.  (Ex. 40) The consent was memorialized in a Second Supplemental Indenture.  (Ex. 6, at 11; Ex. 16)  In addition to the Platinum actors, Hoffman, as Black Elk CEO, as well as Piche and Fuerst, as Black Elk Secretary and General Counsel, were instrumental in facilitating the creation of the Second Supplemental Indenture.  (Ex. 6; Ex. 16)  Again, it was only by improperly including the votes of the affiliated Platinum-controlled, but "disclaimed" or "friendly" entities, that consent allegedly was obtained.

79.     Beginning on August 15, 2014, Black Elk received the following wire transfers relating to the Renaissance Sale:

---

[13] This representation also directly contradicts the method of tabulating results set forth in the Offer to Purchase and Consent Solicitation (Ex. 1, at 2 ("Requisite Consents"), 18-19) and as stated in Black Elk's press release of July 16, 2014:  "If Consents from the holders of at least a majority in principal amount of the outstanding Notes (disregarding any Notes held by affiliates of the Company) have been validly received…."  (Ex. 36, at Ex. 99.1, at 1-2)

| Date | Amegy Bank | Account No. Wire Description | Amount |
|------|-----------|------------------------------|--------|
| 8/15/2014 | ▮ | RENAISSANCE OFFSHORE, LLC;REF M 1306804969 | $ 99,999,999.99 |
| 8/15/2014 | ▮ | RENAISSANCE OFFSHORE, LLC;REF M 1306804970 | $ 19,240,898.44 |
| 8/15/2014 | ▮ | PETROLEUM STRATEGIES, INC.;OBI 1306804015 | $ 5,713,164.64 |
| 8/22/2014 | ▮ | RENAISSANCE OFFSHORE, LLC;REF M 1306604221 | $ 1,059,810.55 |
| | | Total | $126,013,873.49 |

(Ex. 41)

80.      On August 18, 2014, three days after the first three Renaissance wire transfers to Black Elk, Shulse again followed up with Platinum regarding his reward.   In an email to Nordlicht, Small and Levy, Shulse said that "███████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████,[14] (Ex. 42)   Shulse again reminded Platinum that "████████████████████████████████████ ████████████" (*Id.*)  That same day, in an email to Levy and Small, Nordlicht said that "██████ ████████████████████████████████████████████████████" (*Id.*)

81.      Platinum circumvented Hoffman's authority as President and CEO of Black Elk by directing Shulse, based upon the approval of the Platinum-affiliated managers and the alleged

---

[14] The August 18-21, 2014 wire transfers for the Series E preferred equity no doubt worsened Black Elk's insolvency.  However, Black Elk was insolvent months earlier.  By example, Shulse, in a May 20, 2014 email, stated that "████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████" (Ex. 43)

unanimity of the Black Elk Board of Managers, to make the subject transfers without Hoffman's approval or signature.  As noted above, Shulse and Platinum were in that same time frame negotiating Shulse's financial remuneration.  (Ex. 44, at 35-39; Ex. 45)  On information and belief, Platinum agreed to pay Shulse bonuses in the total amount of $550,000, in large part for his involvement and assistance in the Renaissance Sale.  (Ex. 44, at 35-36; Ex. 46, at 10)  Notably, Hoffman had fired Shulse on three occasions in part because Hoffman believed that Shulse was acting in Platinum's best interest at the expense of Black Elk.  (Ex. 4 at 67-69, 134-137)  Each time, Platinum reinstated Shulse.  Immediately following the Renaissance Sale, Platinum appointed Shulse as Black Elk's CEO, after reaching a deal with Hoffman to resign as Black Elk's President and CEO.  (*Id.*; Ex. 47, at 3)

82.     **Platinum Wire Transfers the Renaissance Proceeds to Its Improper Benefit.**

E-mail communications on August 18, 2014 by and between Nordlicht, Shulse, Small, Salfati and Levy demonstrate the mechanics of the final implementation of the plan to improperly transfer nearly $98 million from Black Elk for the benefit of Platinum.  That day, Shulse emailed Nordlicht, with the subject line, "Wire is NOT approved," explaining that Shulse understood that Nordlicht was "talking to John [Hoffman] at 4:00, [but] the wire transfer deadline is 3:30 ... if you want New Mountain paid today, you are going to have to make a decision soon.  I am happy to hit send if the board tells me to, if not it will likely be tomorrow if John approves at 4:00."[15] (Ex. 48)

83.     Five minute later on August 18, 2014, Nordlicht sent an email to Shulse, copying Small, Salfati and Levy, in which Nordlicht represented that "the board is in agreement to send new mountain wire and 50 million to ppbe.  ZThe [sic] balance of the preferred I am going to get

---

[15] The import of the New Mountain transfer is explained further, *infra* at ¶ 87.

you john email so u have unanimous consent on top of his verbal agreement that he has already given me … but send these wires out already!!!!!"  (Ex. 48)  At approximately the same time, Daniel Small also emailed Shulse, copying Salfati:  "Jeff, on behalf of Sam Salfati and myself constituting a majority of the board of managers you are hereby authorized to wire $70 million in partial payment of the Preferred E units, Regards, Dan."  (Ex. 49)  Based on Nordlicht's emphatic, five exclamation point email, and Small's confirmatory email, Shulse then authorized and requested the release of the wires "per Mark's [Nordlicht's] direction."  (Ex. 48)

84.     On August 18, David Levy, from his Platinum email address, also sent Shulse, at his personal email address, the PPCOMF wire transfer instructions.  On August 20, Shulse then forwarded on these instructions with the direction to Black Elk employees that "[t]he board has also requested and approved the payment of $24,600,584.31 of Series E preferred to Platinum Partners Credit Opportunities Master Fund LP … wire instructions below ... needs to go today." (Ex. 50)

85.     Between August 18 and 21, 2014, Black Elk remitted the following wire transfers, pursuant to the instruction of Platinum, and particularly the involvement and direction of Nordlicht, Levy, Small, Salfati, and Shulse, and without the intervention and prevention of the transfers by Hoffman, Piche or Fuerst:

| Date | Amegy Bank Account No. | Wire Description | Amount |
|------|------------------------|------------------|--------|
| 8/18/2014 | | PPVA Black Elk Equity LLC 1307003426 | $ 32,563,819.73 |
| 8/18/2014 | | New Mountain Finance Corp 1307003422 | $ 20,462,777.78 |
| 8/18/2014 | | Platinum Partners Value Arbitrage  1307003428 | $ 15,332,672.97 |
| 8/19/2014 | | The Bank of New York Mellon 1306701696 | $ 11,773,608.13 |
| 8/20/2014 | | Platinum Partners Credit Opportunity 1306102280 | $ 24,600,584.31 |
| 8/21/2014 | | Platinum Partners Liquid Opportunity 1306101216 | $  5,000,000.00 |
| | | Total | $109,733,462.92 |

(Ex. 76)

86.     These remittances, except for the Bank of New York Mellon for the tendered Notes, all benefitted Platinum.  The benefit of the transfers to the named Platinum entities is obvious.

87.     The New Mountain transfer also benefitted Platinum because Platinum was able to avoid buying back the New Mountain Series E preferred equity under a put agreement. Platinum and New Mountain Finance Holdings, LLC entered into a Securities Purchase and Put Agreement in May 2013 in which New Mountain Finance Holdings, LLC paid $20 million for Series E preferred equity, with the right to have Platinum repurchase the Series E preferred equity on a dollar-dollar basis, plus any accrued, uncapitalized, and unpaid Series E preferred return, plus interest.  (Ex. 20, at 2)  New Mountain Finance Holdings, LLC entered into this Agreement based in part upon the fact that Platinum controlled Black Elk:  the agreement recites that "Platinum, along with one or more of its affiliates, beneficially owns a majority of Black Elk Energy's outstanding voting interests and a majority of Black Elk Energy's outstanding membership interests."  (Ex. 20, at 1)  New Mountain Finance Holdings, LLC then assigned the

31

agreement to New Mountain Finance Corp. by second amendment dated May 23, 2014.  (Ex. 87)
A third amendment further extended the put agreement to July 16, 2014.  (Ex. 78)  A fourth
amendment extended the time to August 15, 2014.  (Ex. 79)  Platinum was in default of the
fourth amendment when Black Elk transferred the wire on August 18.

88.     These remittances improperly enriched Platinum by approximately $98 million.[16]
On August 19, 2014, Black Elk, under Hoffman's signature, instructed Bank of New York
Mellon to extinguish $11,433,000 of notes tendered.  (Ex. 52)

89.     Although Platinum improperly benefitted by almost $100 million,[17] the effect on
Black Elk was equally stark but devastating.  As Black Elk's founder and CEO Hoffman has
testified, "As soon as the 96 [sic] million went to New York [to benefit Platinum], we [Black
Elk] were bankrupted."  (Ex. 4, at 130)  When asked whether Black Elk was insolvent after the
wire transfers to Platinum, Hoffman unequivocally responded "Absolutely" and "No question."[18]
(*Id.*)

---

[16] Liskow & Lewis withdrew as counsel for Black Elk on or around July 21, 2014 in part because
of the "several calls from [Black Elk] employees raising questions about the use of proceeds
from [Renaissance] asset sales."  (Ex. 51)  Liskow & Lewis stated that "[t]hese recent
developments and conflicts made us uncomfortable with continuing to advise [Black Elk] and
therefore led us to conclude that we needed to withdraw from any further  representation of the
company, other than to continue assisting in the imminent closing of the Renaissance Offshore,
LLC sale (the "Renaissance Transaction") if [Black Elk] so desires."  Liskow & Lewis made
clear that "we do not and have not advised [Black Elk] how the proceeds from the Renaissance
Transaction or any other sale transaction are to, or were to, be applied…."  (Ex. 51)

[17] The impropriety of Platinum's actions is forcefully stated in the resignation letter of one of
Black Elk's executives, who concluded his resignation letter with the following: "For these
reasons, I resign my position as Facilities Manager as I cannot legally and morally continue
forward knowing I will be taking part of fraudulent activities."  (Ex. 53)

[18] In October 2014, as things worsened at Black Elk, Shulse sent an email to Nordlicht, Small,
and Levy describing the risks and likely adverse results from pending litigation.  (Ex. 80)  Levy
first chastised Shulse for not including Fuerst, saying "I'm sure you meant to add Steve to this
and note it is a privileged communication part of litigation."  To that, Nordlicht responded "All
the more reason to pay back preferred and get the positive fields sold."  (*Id.*)  Shulse, incredulous
that Nordlicht just described the Series E preferred equity scheme, emails Small:  "He really just

90.     The impropriety of the Series E wire transfers after the Renaissance Sale also was later discussed by and between Platinum's David Levy and Zach Weiner, and Platinum's third CEO at Black Elk, Jed Latkin, in a July 2015 email.  (Ex. 89)  Latkin informed Levy and Weiner that BDO wanted "a full breakdown of where every dollar went from the renaissance transaction including a breakdown of the payouts to platinum and its related entities," also "wanted to state in the notes that they believe this transaction violated the indenture and was a preferential payment," and that "they would indicate in the filing that there was control and manipulation by the parent ownership company."  (*Id*.)

### C.     Platinum's Misappropriation of Black Elk's Northstar Offshore Transaction

91.     In May 2014, Black Elk entered into negotiations to purchase certain of Northstar Offshore Group 1, LLC' s ("Northstar Offshore") oil and gas properties in the Gulf of Mexico. (Ex. 54)  The parties contemplated a purchase price of $100 million and entering into a Purchase and Sale Agreement by July 1, 2014.  (*Id*.)  As a part of the parties' agreement, Northstar agreed to negotiate exclusively with Black Elk from May 27, 2014 through July 1, 2014, recognizing that Black Elk was going to expend significant corporate resources conducting its due diligence on the subject properties.  (*Id.*)

92.     According to Black Elk's founder and CEO Hoffman, Black Elk invested substantial man-hours and significant resources conducting its due diligence on the Northstar properties.  (Ex. 4, at 23-24)  Hoffman estimated that Black Elk spent "millions" on due diligence matters, including but not limited to, field visits, legal fees, technical resource time, use of software and title work.  (*Id.*)  Hoffman, who was intimately involved in the negotiation, due

---

put that in writing? … With all due respect, some things should just stay in his head."  (*Id.*) Platinum understood that after it misappropriated the Renaissance Sale proceeds, Black Elk was a dead company walking.

diligence and purchase of the Northstar properties, stated that at the eleventh hour, Platinum or a Platinum affiliate was substituted in for Black Elk on the draft Purchase and Sale Agreement, and Northstar ultimately sold the properties to a Platinum entity.[19]  (Ex. 4, at 16-17)  Hoffman and Piche considered, but did not pursue, legal or other action against Platinum to prevent its usurpation of the opportunity.  (Ex. 55)

93.     Shortly thereafter, members of Black Elk's management team, including Hoffman, contacted counsel who had drafted the Northstar PSA to alert them to the fact that Platinum had usurped Black Elk's corporate opportunity without compensating Black Elk for the monies and manpower it had expended on due diligence.  (*Id.*, at 17-19)  Upon hearing that Black Elk's personnel were used to develop prospects for Platinum, with no benefit or value flowing to Black Elk, Liskow & Lewis, who was counsel for Black Elk, resigned from its representation of Black Elk in the Northstar transaction.[20]  (Ex. 51)

---

[19] On June 5, 2014, Levy, as CIO of B Asset Manager for Beechwood, provided Black Elk an intention letter to fund Black Elk's acquisition of Northstar.  (Ex. 56)  On June 27, 2014, Levy sent a letter to Black Elk withdrawing its prior interest in financing the Northstar transaction, stating:  "To reiterate, due to the current financial situation of Black Elk, BAM [B Asset Manager] is no longer interested in further exploring financing Black Elk in connection with those potential acquisitions referenced in the Interest Letters and each such Interest Letter has been withdrawn as a result of further review of Black Elk."  (Ex. 57)  Of course, Levy always had been aware of Black Elk's financial condition, given his prior and concurrent role with Platinum and oversight of Black Elk.  Also on June 27, Shulse sent a "Renaissance Update" email to Platinum and Levy, while he was at Beechwood, that the Renaissance transaction had hit a snag because Renaissance was "getting advice from V&E regarding [a possible Black Elk] bankruptcy."  (Ex. 58)

[20] In its email dated July 21, 2014, Liskow & Lewis stated that they believed that "the use of [Black Elk] personnel to develop [Northstar] prospects, including drafting and negotiating purchase and sale agreements for such entities, …, if true, raised questions of the appropriate use of company assets, possible usurpation of corporate opportunities and other potential legal and equitable claims."  (Ex. 51)

**D.     Platinum Takes the Remainder of Black Elk's Assets for Northstar Offshore.**

94.     After wrongfully purchasing Northstar Offshore, Platinum caused Black Elk to sell the remainder of its assets to Platinum through a PSA with Northstar Offshore in early 2015. (Ex. 59)  Nordlicht, Small, Levy, Salfati, and Shulse all were involved in the planning and implementation of this transaction, as set forth in part by Small's December 19, 2014 email (Ex. 60) describing the planned execution of the transaction.  The Black Elk Notes for Northstar preferred equity exchange portion of this scheme was succinctly stated in Small's January 28, 2015 email to other Platinum executives, including Levy:  "█████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ██████████████████████████"  (Ex. 61; Ex. 62)

95.     By this time, Shulse had been appointed CEO of Black Elk.  (Ex. 47)  In pertinent part, Black Elk was selling certain of its remaining oil and gas properties to Northstar in exchange for Northstar assuming $70 million of the Senior Secured Notes issued by Black Elk and owned by Platinum and its affiliates.  (Ex. 59)

96.     According to Shulse, he signed, but did not date, the PSA between Black Elk and Northstar because he was not comfortable with closing the transaction over concerns he had that the transaction would be a fraudulent transfer.  (Ex. 44, at 185-86)  Shulse indicated that he signed the Northstar PSA at Platinum's repeated requests, in effect "we did this fake closing" for Platinum's benefit.  (*Id.*, at 181, 185-86)

97.     Ultimately, on March 31, 2015, Shulse sent a letter to Northstar's CEO notifying Northstar that it was to remove his signature from all documents related to the proposed sale of assets from Black Elk to Northstar because "I have been advised by counsel that the Transaction

would qualify as **Fraudulent Transfer** under the Uniform Fraudulent Transfer Act ("UFTA"), as adopted by the State of Texas."  (Ex. 63 (emphasis in original))  Thus, Black Elk's then CEO revoked his approval and authority for Black Elk to enter into the PSA with Northstar.  (*Id.*)

98.     Even though Shulse had revoked his approval of the Northstar transaction, Platinum purportedly closed the transaction and attempted to convey the subject properties to Northstar for its own benefit.  (Ex. 59)

### E. Platinum Fakes Another Black Elk Closing and Assignment to TKN Offshore.

99.     Shortly after the Northstar Offshore transaction, Shulse decided that he was going to leave Black Elk and start his own company.  (Ex. 44, at 182-83, 190-98)  As a part of his exit strategy, Shulse wanted to purchase certain of the few remaining properties from Black Elk and Black Elk's interest in Freedom Well Services, LLC.  (*Id.*)

100.     For the planned purchase, Shulse formed two companies, both of which he wholly owned, namely TKN Petroleum Holdings, LLC ("TKN") and Medius Energy, LLC ("Medius"). (*Id.*)  Platinum negotiated the proposed sale on behalf of Black Elk and Shulse negotiated on behalf of TKN and Medius.  (*Id.*)  Platinum negotiated this transaction through its surrogate, John Boylan, whom Platinum approved appointing as Acting CEO and alleged Independent Director of Black Elk, with the participation of Platinum and Shulse, and the drafting and legal advice of Fuerst.[21]  (Ex. 81)  According to Shulse, the parties never reached an agreement on the proposed sale of assets to TKN and Medius, even though Boylan and Shulse signed a PSA

---

[21] Boylan began discussing helping Platinum and Shulse with their "wind down(?)" of Black Elk as early June 30, 2014.  (Exs. 82-84)

(Ex. 88) related to the proposed sale.  (Ex 44, at 181-183, 190-194, 196-197)  There also are Black Elk Board Minutes dated February 6, 2015 allegedly approving the transaction.[22]  (Ex. 81)

101.    Shulse ultimately resigned and left Black Elk having never reached an agreement to purchase certain Black Elk properties and Freedom Well Services.   (Ex. 44, at 196) Notwithstanding the fact that TKN and Medius' sole owner and principal never consummated the deal, Platinum purportedly closed the sale and conveyed the assets to another, Platinum TKN.  (Ex. 64)

102.    In an effort to conceal the fraudulent closing, upon information and belief, Platinum then formed a new entity, TKN Petroleum Offshore, LLC ("TKN Offshore"), to purchase the properties allegedly sold to TKN.  Platinum drafted, signed and executed a phony Purchase and Sale Agreement between TKN and TKN Offshore.  (Ex. 64)  The fraudulent PSA was signed by Platinum's Salfati on behalf of TKN.  (*Id.*)  Salfati, however, was not an officer, director, employee, agent or representative of TKN.  (Ex. 44, at 200-01)  Salfati had no authority to sign any agreement on behalf of TKN; Shulse was the only person authorized to enter into such an agreement on behalf of TKN and he claims that knew nothing about the fraudulent TKN/TKN Offshore PSA.  (*Id.*)

103.    After the fraudulent sale to TKN Offshore, Platinum started the process of transferring the Black Elk properties to TKN Offshore, leaving Black Elk with the few assets it had at the beginning of Black Elk's Bankruptcy Case.

---

[22] Although the Board Minutes state that Boylan presented an analysis of the transaction for the Board to review before approval, four days later on February 10, Fuerst sent an email with the subject line "Bd Meeting" to Small, copying Shulse, Salfati, and Levy, stating that "I haven't seen any analysis (Boylan's Medius Report) for the Northstar deal."  (Ex. 85)  On March 12, 2015, Boylan followed up with Shulse regarding his invoice and also asked to get a "Certificate of D&O Insurance, which includes John Boylan."  (Ex. 86)

## VI.
## CLAIMS FOR RELIEF

**COUNT I - FRAUDULENT TRANSFERS PURSUANT TO 11 U.S.C. § 548(A)(1)(A)**

104.    The Trustee incorporates all preceding paragraphs as if fully re-alleged herein.

105.    Pursuant to § 548(a)(1)(A) of the Bankruptcy Code, a trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted.

106.    As set forth above, immediately following the Renaissance Sale and within the two-year period prior to the Petition Date, Platinum directed and caused Black Elk to wire $97,959,854.79 of the sale proceeds to and for the benefit of Platinum to repurchase Series E preferred equity.

107.    There are creditors of Black Elk who have allowable claims against Black Elk which claims were in existence at the time of the transfers.  The subject transfers were made by Black Elk at Platinum's direction with actual intent to hinder, delay, or defraud its then existing and future creditors.

108.    As set forth above, Black Elk's fraudulent intent in this instance is evidenced as (i) the transfers were made to insiders of Black Elk; (ii) the transfers were concealed or effectuated via fraud; (iii) the transfers were substantially all of Black Elk's productive assets (or the proceeds thereof); (iv) Black Elk removed or concealed assets; (v) the value of the consideration received by Black Elk was not reasonably equivalent to value of the transfers; (vi) Black Elk was insolvent or became insolvent shortly after the transfers were made; (vii) the

transfers occurred shortly before or shortly after Black Elk incurred substantial debt; (viii) Black Elk transferred essential assets (or the proceeds thereof) to a lienor who transferred the assets to an insider; and (ix) Black Elk engaged in a pattern of sharp dealing prior to bankruptcy.

109.    Accordingly, Trustee requests that the Court avoid the subject transfers as actual fraudulent transfers under section § 548(a)(1)(A).

## COUNT II - FRAUDULENT TRANSFERS PURSUANT TO 11 U.S.C. § 548(A)(1)(B)

110.    The Trustee incorporates all preceding paragraphs as if fully re-alleged herein.

111.    Pursuant to § 548(a)(1)(B) of the Bankruptcy Code, a trustee may avoid any transfer of an interest of the debtor in property that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily received less than a reasonably equivalent value in exchange for such transfer and was insolvent on the date that such transfer was made or became insolvent as a result of such transfer.

112.    As set forth above, immediately following the Renaissance Sale and within the two-year period prior to the Petition Date, Platinum directed and caused Black Elk to wire $97,959,854.79 of the sale proceeds to Defendants to repurchase the Series E shares held by Defendants.  Because the subject transfers were used to retire the Series E preferred shares, Black Elk received less than a reasonably equivalent value in exchange for the transfers.

113.    Further, both before and after the Renaissance Sale, Black Elk was insolvent and unable to pay its debts as they became due.

114.    Accordingly, the Trustee requests that the Court avoid the subject transfers as actual fraudulent transfers under section § 548(a)(1)(B).

## COUNT III - VIOLATIONS OF THE TEXAS UNIFORM FRAUDULENT TRANSFER ACT

115.    The Trustee incorporates all preceding paragraphs as if fully re-alleged herein.

116. The Texas Uniform Fraudulent Transfer Act ("TUFTA"), codified as chapter 24 of the Texas Business and Commerce Code, permits the recovery of the value of any transfers made with "actual intent to hinder, delay, or defraud any creditor of the debtor" as well as those made "without receiving a reasonably equivalent value in exchange for the transfer or obligation." Tex. Bus. & Com. Code Ann. § 24.005. Transfers made within four years of the Petition Date may be avoided. *Id.* at § 24.006. TUFTA defines transfers fraudulent as to present or future creditors as:

(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or within a reasonable time after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or

(2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

(A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

(B) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

Tex. Bus. & Com. Code Ann. § 24.005.

117. Section 544(b) of the Bankruptcy Code allows the trustee to avoid a transfer of Black Elk's interest in property that is voidable under applicable law—in this case, TUFTA. Section 550 of the Bankruptcy Code allows the Trustee to recover the property transferred or the value of the property transferred in violation of sections 544 and 548.

118.    As it relates to the Renaissance Sale and the Series E wire transfers, these transfers to the Platinum insiders and their affiliates were fraudulent as to Black Elk's present and future creditors and in violation of TUFTA, as set forth above.

119.    Further, Tex. Bus. & Com. Code Ann. § 24.006 defines transfers fraudulent as to present creditors as:

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

> (b) A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent.

Tex. Bus. & Com. Code Ann. § 24.006.

120.    The $97,959,854.79 in wire transfers to Platinum insiders and their affiliates are likewise in violation of § 24.006 of TUFTA.

121.    Platinum Partners Value Arbitrage Fund LP, Platinum Partners Credit Opportunities Master Fund LP, Platinum Partners Liquid Opportunities Master Fund, LP, and PPVA Black Elk Equity LLC, are liable as the recipient transferees of these funds or the persons for whose benefit the transfers were made.  These transfers were intentional and initiated by the Platinum defendants, as they controlled Black Elk's Board of Managers and caused Black Elk to make the transfers.

122.    Accordingly, the Trustee respectfully requests that the Court avoid the subject transfers as actual and/or constructive fraudulent transfers under section 544(b) and applicable Texas state law, and recover the value of the transferred property pursuant to section 550 of the Bankruptcy Code.

**COUNT IV - RECOVERY OF AVOIDED TRANSFERS PURSUANT TO 11 U.S.C. § 550**

123.    The Trustee incorporates all preceding paragraphs as if fully re-alleged herein.

124.    Section 550 of the Bankruptcy Code allows the trustee to recover, for the benefit of the estate, the property or the value of the property transferred and avoided under sections 544 and 548 from the initial transferee of such transfer or the entity for whose benefit such transfer was made.

125.    Here, as set forth above, the Trustee is entitled to avoid, under sections 544 and 548, transfers of $97,959,854.79.

126.    Platinum Partners Value Arbitrage Fund LP, Platinum Partners Credit Opportunities Master Fund LP, Platinum Partners Liquid Opportunities Master Fund, LP, and PPVA Black Elk Equity LLC are the initial transferees or persons for whose benefit the transfers were made.

127.    Thus, pursuant to section 550 of the Bankruptcy Code, the Trustee is entitled to recover the amounts transferred.

**COUNT V - ALTER EGO**

128.    The Trustee incorporates all preceding paragraphs as if fully re-alleged herein.

129.    Platinum exercised its control over Black Elk to such a degree that Black Elk operated as nothing more than Platinum's tool or business conduit.  Evidence of such domination includes, among other indicia of domination, Platinum having directed Black Elk to engage in specific business transactions, causing Black Elk to terminate existing business relationships in favor of entities related to or affiliated with Platinum, and controlling which of Black Elk's vendors were paid and when.  Upon information and belief, Platinum's control was so pervasive that Black Elk's management was virtually unable to make even the most basic business decisions without first obtaining direction and approval from Platinum's personnel.

130.    Platinum used this domination of Black Elk inequitably and to the detriment of Black Elk and Black Elk's creditors by, among other actions, preventing Black Elk from paying is legitimate debts while diverting assets to the benefit of Platinum and its affiliates and insiders.

131.    Further, Platinum used its control to cause Black Elk to defraud its creditors by, inter alia, entering into contracts or otherwise incurring obligations that Black Elk could not or would not perform and falsely represented to creditors that certain funds were or would be available to satisfy Black Elk's obligations.

132.    For example, at the direction of Platinum, Black Elk falsely represented to its creditors that certain bond collateral would be made available to satisfy Black Elk's obligations even though Platinum had already directed Black Elk to divert such funds to Platinum's benefit.

133.    At the time that these misrepresentations were made, both Black Elk and Platinum knew or should have known that such representations were false; Platinum directed Black Elk to make such false representations with the intent that Black Elk's creditors and contract counter-parties rely and act upon such misrepresentations.  Upon information and belief, as a result of such fraudulent activity, Black Elk incurred tens of millions of dollars in debt and substantial non-monetary obligations that Black Elk was unable or unwilling to perform.

134.    Pursuant to Texas law, Platinum may be deemed liable for such fraudulently incurred obligations.

## COUNT VI - CLAIM OBJECTION

135.    Platinum filed the following proofs of claim against Black Elk in the above-referenced bankruptcy case:

| Platinum Defendant | Claim Number | Claim Amount |
|---|---|---|
| PPVAF | 224; 242 | $22,620,000 in principal $1,555,262.50 in interest |

| PPVA BE | 231 | unknown |
| PPLOMF | 240 | $10,668,000 in principal $733,425 in interest |
| PPCOMF | 241 | $29,582,000 |

136.    Platinum are entities from which property, in the form of the transfers detailed herein, is recoverable under sections 548 and 550 of the Bankruptcy Code.  Platinum has not returned the transfers to the Trustee.  Accordingly, any and all claims of Platinum against Black Elk's estate must be disallowed until such time as Platinum pays to the Trustee an amount equal to the aggregate amount of the Transfers, plus interest thereon and costs.

**COUNT VII - EQUITABLE SUBORDINATION**

137.    Section 510(c) of the Bankruptcy Code provides that a bankruptcy court may, "under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim, or all or part of an allowed interest to all or part of another allowed interest...." 11 U.S.C. § 510(c)(1).  Equitable subordination pursuant to § 510(c) is appropriate when (i) a claimant has engaged in some type of inequitable conduct; and (ii) such misconduct has resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant.

138.    As set forth above, Platinum undertook a scheme allowing Platinum to divert the Renaissance Sale proceeds to itself to pay off its Series E preferred equity before bankruptcy, thereby benefiting itself to the same extent as it would by paying off Senior Secured Notes while at the same time maintaining its secured creditor position as a Holder of Senior Secured Notes at the head of the line to receive any assets from Black Elk's estate in the foreseeable bankruptcy.

139.    By further examples, Platinum made fraudulent transfers with respect to a Platinum-controlled credit facility company, White Elk, and also both appropriated a corporate

opportunity and then later improperly transferred assets with respect to a company called Northstar and later still improperly transferred assets to TKN Offshore.

140.     Through its dominion and control over Black Elk, Platinum caused Black Elk to engage in a pattern of conduct designed to harass, delay, and defraud Black Elk's creditors.  In particular, to increase liquidity Platinum caused Black Elk to "stretch" accounts payable – delaying the paying of trade indebtedness in order to facilitate Platinum's plunder set forth in this Complaint.

141.     As a result of these acts and others, the Trustee seeks to equitably subordinate all of Platinum's claims against Black Elk pursuant to 11 U.S.C. § 510(c).   Platinum's acts constituted inequitable conduct and misconduct by Platinum, which caused harm and injured Black Elk and Black Elk's creditors and conferred an unfair advantage to Platinum.  Equitable subordination of all of the Platinum's claims will prevent the occurrence of injustice or unfairness in the administration of Black Elk's bankruptcy estate and is not inconsistent with the provisions of the Bankruptcy Code.

## VII.
## PRAYER

142.     For these reasons, the Trustee asks for judgment against Platinum for the following:

(a)     actual damages;

(b)     exemplary damages;

(c)     prejudgment and post-judgment interest on all amounts recovered in this adversary proceeding;

(0     reasonable attorney fees;

(g)     court costs;

(h)     injunctive relief as set forth in the concurrently filed TRO/PI Application; and

45

(i)     all other legal and equitable relief to which the Trustee is entitled.

Dated October 26, 2016.

Respectfully submitted,

By: _/s/  Craig Smyser_

SMYSER KAPLAN & VESELKA, L.L.P.
Craig Smyser
Attorney-in-Charge
Texas Bar No. 18777575
Fed. Bar No. 848
csmyser@skv.com
700 Louisiana, Suite 2300
Houston, Texas 77002
713-221-2300
713-221-2320 (fax)

Of Counsel:

SMYSER KAPLAN & VESELKA, L.L.P.
Jeff Potts
Texas Bar No. 00784781
Fed. Bar No. 16504
Justin Waggoner
Texas Bar No. 24003122
Fed. Bar No. 23098
700 Louisiana, Suite 2300
Houston, Texas 77002
713-221-2300
713-221-2320 (fax)
jpotts@skv.com
jwaggoner@skv.com

OKIN ADAMS LLP
Matthew Okin
Texas Bar No. 00784695
Fed. Bar No. 15204
David Curry, Jr.
Texas Bar No. 24065107
Fed. Bar No. 975482
1113 Vine St., Suite 201
Houston, Texas 77002
713-228-4100
888-865-2118
mokin@okinadams.com
dcurry@okinadams.com

**ATTORNEYS FOR TRUSTEE**