# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § § | |
| BLACK ELK ENERGY OFFSHORE OPERATIONS, LLC | § § § | CASE NO. 15-34287 (MI) |
| DEBTOR. | § § | CHAPTER 11 |
| RICHARD SCHMIDT, LITIGATION TRUSTEE, | § § | |
| PLAINTIFF, | § § | |
| VS. | § § | ADVERSARY NO. 16-03237 |
| PLATINUM PARTNERS VALUE ARBITRAGE FUND LP, PLATINUM PARTNERS CREDIT OPPORTUNITIES MASTER FUND LP, PLATINUM PARTNERS LIQUID OPPORTUNITIES MASTER FUND LP, AND PPVA BLACK ELK (EQUITY) LLC, | § § § § § § § § | |
| DEFENDANTS. | § § | |

## OPPOSITION BY RECEIVER TO
## TRUSTEE'S APPLICATION FOR PRELIMINARY INJUNCTIVE RELIEF

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ................................................................................. 1

FACTUAL BACKGROUND ...................................................................................... 3

    The Trustee's Complaint and the Black Elk TRO ............................................. 3

    PPCO and PPLO's Need to Make Payments, and Their Submission of Expense
        Requests to the Trustee's Counsel ........................................................ 5

    The Indictment, SEC Complaint, and the Appointment of a Receiver ............................. 6

    The Receiver .......................................................................................... 7

    The Terms of the Receiver Order ................................................................. 8

    The Receiver's Acts to Protect Receivership Property Following His Appointment ...... 10

    The Trustee's Failure to Approve Expenses After the Appointment of the
        Receiver ........................................................................................ 10

    The Joint Application by the SEC and the Receiver in the U.S. District Court for
        the Eastern District of New York ......................................................... 12

    The Receivership Entities' Cash Position ...................................................... 14

ARGUMENT .......................................................................................................... 15

I.    THE TRUSTEE CANNOT DEMONSTRATE IRREPARABLE INJURY ................... 16

    A.    The Receivership Protects the Assets from Dissipation ...................... 16

    B.    The Receiver is Marshalling Assets to Ensure Maximum Possible
        Repayment ..................................................................................... 17

    C.    The Trustee's Desire to Improve Its Position at the Expense of Other
        Creditors Does Not Constitute Irreparable Injury .............................. 19

II.    PPCO AND PPLO INVESTORS AND CREDITORS – INCLUDING THE
    TRUST – WILL SUFFER IRREPARABLE HARM IF A PRELIMINARY
    INJUNCTION IS ENTERED INTERFERING WITH THE RECEIVER'S
    ABILITY TO MARSHAL AND PRESERVE THE ASSETS AT ISSUE ..................... 21

    A.    The Receiver, and the Innocent Parties the Receiver was Appointed to
        Protect, Will Be Irreparably Injured if the Receiver Is Not Permitted to
        Use PPCO and PPLO's Liquid Assets to Preserve the Value of the
        Receivership Estate ........................................................................ 22

    B.    A Preliminary Injunction Requiring the Receiver to Obtain the Approval
        of the Trustee or this Court to Expend Receivership Assets Serves No
        Purpose and Will Injure the Receiver, and the Innocent Parties He Was
        Appointed to Protect ...................................................................... 23

**TABLE OF CONTENTS**
**(continued)**

Page

III.    A PRELIMINARY INJUNCTION WOULD DISSERVE THE PUBLIC
        INTEREST BY FAVORING ONE CREDITOR OVER OTHERS ............................... 25

CONCLUSION ......................................................................................................................... 27

D/959885v1

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.T.N. Indus., Inc. v. Gross*,
  632 F. App'x 185 (5th Cir. 2015) ........................................................................................16

*In re Atlas Fin. Mortg., Inc.*,
  No. 13-32683-BJH-7, 2014 WL 172283 (Bankr. N.D. Tex. Jan. 14, 2014)...........................16

*Bluefield Water Ass'n, Inc. v. City of Starkville, Miss.*,
  577 F.3d 250 (5th Cir. 2009) ..............................................................................................16

*In re Emerald Oil Co.*,
  807 F.2d 1234 (5th Cir. 1987) ............................................................................................20

*In re Focus Media Inc.*,
  387 F.3d 1077 (9th Cir. 2004) ............................................................................................16

*Matter of Haber Oil Co., Inc.*,
  12 F.3d 426 (5th Cir. 1994) ...................................................................................19, 20, 21

*Holland Am. Ins. Co. v. Succession of Roy*,
  777 F.2d 992 (5th Cir. 1985) ..............................................................................................16

*Janvey v. Alguire*,
  647 F.3d 585 (5th Cir. 2011) .......................................................................................15, 19

*Kalsi Eng'g, Inc. v. Davidson*,
  No. CV H-14-1405, 2014 WL 12540550 (S.D. Tex. Sept. 2, 2014) ....................................16

*In re OGA Charters, LLC*,
  554 B.R. 415 (Bankr. S.D. Tex. 2016) ................................................................................25

*Rishmague v. Winter*,
  616 F. App'x 138 (5th Cir. 2015) .............................................................................17, 22, 24

*Rosenberg v. Collins*,
  624 F.2d 659 (5th Cir. 1980) ..............................................................................................20

*S.E.C. v. Byers*,
  592 F. Supp. 2d 532 (S.D.N.Y. 2008)...........................................................................17, 26

*S.E.C. v. Forex Asset Mgmt. LLC*,
  242 F.3d 325 (5th Cir. 2001) ..............................................................................................20

D/959885v1

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*S.E.C. v. Sharp Capital, Inc.*,
   315 F.3d 541 (5th Cir. 2003) ................................................................18

*S.E.C. v. Stanford Int'l Bank Ltd.*,
   424 F. App'x 338 (5th Cir. 2011) ...............................................17, 22, 24

*S.E.C. v. Wencke*,
   742 F.2d 1230 (9th Cir. 1984) ..............................................................24

*S.E.C v. Wencke*,
   783 F.2d 829 (9th Cir. 1986) ................................................................17

*Matter of S.I. Acquisition, Inc.*,
   817 F.2d 1142 (5th Cir. 1987) ..............................................................21

*Schauss v. Metals Depository Corp.*,
   757 F.2d 649 (5th Cir. 1985) ..........................................................17, 26

*Matter of Southmark Corp.*,
   49 F.3d 1111 (5th Cir. 1995) ..........................................................19, 21

*United States v. Durham*,
   86 F.3d 70 (5th Cir. 1996) ........................................................19, 20, 21

*USACO Coal Co. v. Carbomin Energy, Inc.*,
   689 F.2d 94 (6th Cir. 1982) ..................................................................16

*Winter v. Natural Res. Defense Council*,
   555 U.S. 7 (2008) ............................................................................15, 16

D/959885v1

**PRELIMINARY STATEMENT**

1.        On October 26, 2016, Richard Schmidt (the "Trustee"), the Trustee of the Black

Elk Litigation Trust (the "Trust"), filed a complaint alleging that four entities affiliated with

Platinum, a group of hedge funds based in New York which at one point in time purported to

have $1.7 billion under management, had engaged in a scheme to defraud Black Elk Energy

Offshore Operations, LLC ("Black Elk"), the debtor in this case.  The Trustee simultaneously

moved for a preliminary injunction and other emergency relief based on the risk that the

allegedly fraudulently transferred funds would be dissipated by Platinum managers.  On October

26, 2016, this Court issued a temporary restraining order (the "Black Elk TRO").  The Black Elk

TRO prevented two of the defendants in this adversary proceeding – Platinum Partners Credit

Opportunities Master Fund LP ("PPCO") and Platinum Partners Liquid Opportunities Master

Fund LP (together with related entities, "PPLO")[1] – from transferring money from their bank

accounts unless the balance in their accounts exceeded $24,600,584.30 and $5 million,

respectively.  The Court issued the Black Elk TRO based on its finding that the assets at issue

might be further dissipated due to the defendants' alleged illegal financial maneuverings.

2.        Because PPCO and PPLO had nowhere near that amount of cash, the effect of the

Black Elk TRO was to prevent PPCO and PPLO from spending any money.  On October 27,

2016, the Court modified the Black Elk TRO to permit PPCO and PPLO to pay the salary of

certain Platinum employees, and to make such other payments as authorized by the Trustee or his

counsel, or alternatively, the Court.

---

[1] At the outset of this action counsel understood that the defendant named Platinum Partners Liquid Opportunities
Master Fund LP and alleged to be a Delaware entity was affiliated with Platinum Liquid Opportunity Management
(NY) LLC, Platinum Partners Liquid Opportunity Fund (USA) L.P., and related entities.  Counsel has recently come
to understand that there may be no such Delaware entity and is no longer sure of what entity the Trustee meant to
name in as a defendant.  Until that confusion is resolved, counsel will continue to refer to that other defendant as
PPLO.

3.     The circumstances presented to the Court have changed dramatically since the Black Elk TRO was issued. On December 19, 2017, seven Platinum managers were indicted in the U.S. District Court for the Eastern District of New York.  In addition, the Securities and Exchange Commission (the "SEC") filed a civil lawsuit against those individuals and others, and obtained the appointment of a receiver (the "Receiver") to take control of various Platinum entities, including PPCO and PPLO (collectively, the "Receivership Entities").

4.     The Receiver is a prominent member of the New York bar who served, among other positions, as the Chief of the Criminal Division in the U.S. Attorney's Office for the Southern District of New York.  Since his appointment, the Receiver has fired the indicted Platinum individuals, barred them from Platinum's offices, and taken various measures to ensure that they have no access to or control over the assets of the Receivership Entities ("Receivership Property").  The Receiver has also begun the process of determining what assets the Receivership Entities have, and how to preserve and maximize those assets for the benefit of all creditors and all investors.  Based on the information presently available to him, the Receiver believes that at least some of the Receivership Entities (including PPCO) have valuable illiquid assets, and that with proper management and financial support, those assets may yield real value for the Receivership Estate.

5.     In light of those changed circumstances, the preliminary injunction sought by the Trustee – an order freezing funds in an amount equal to the money transferred from Black Elk to PPCO and PPLO (collectively, $29.6 million) – should not be issued.  The Trustee can no longer demonstrate irreparable injury.  Given the appointment of the Receiver, there is no longer any danger of dissipation of assets or improper dealings.  Nor can the Trustee demonstrate that the Trust will be deprived of a remedy.  The Trustee will be entitled to make a claim in the

D/959885v1

receivership pursuant to a liquidation plan (the "Liquidation Plan") developed by the Receiver in consultation with the SEC and subject to the final approval of the Chief Judge of the U.S. District Court for the Eastern District of New York (Hon. Dora Lizette Irizarry).

6.      Furthermore, the public interest will be disserved if a preliminary injunction is granted.  The preliminary injunction sought by the Trustee would prevent the Receiver from using PPCO's and PPLO's liquid assets to protect the value of the illiquid assets in the Receiver's care.  Paradoxically, if the Trustee's motion is granted, the victims of the Platinum fraud– *including the Trust* – will suffer because the Receiver will not be able to preserve the value of the Receivership Estate.  By contrast, if the motion is denied, the Receiver will be able to fulfill his duties to preserve the value of those assets, thus benefitting *all* the victims of the Platinum fraud, including the Trust.

7.      While it appears that the Black Elk creditors have been injured, there are many other injured parties as well.  The Receiver's current estimate shows over $85.5 million allegedly owed to creditors of PPCO and PPLO (not including the Trust or persons associated with Platinum) and over $33 million in unpaid redemption requests.  The most recent unaudited estimates of net asset value ("NAV") (*i.e.*, the value of the investments made by PPCO and PPLO investors) are approximately $520 million and $23 million respectively.  The Receiver respectfully submits that compensating those parties and others entitled to make claims against the Receivership Entities through a receivership supervised by the SEC and Chief Judge Irizarry is in the best interests of the public.

## FACTUAL BACKGROUND

### The Trustee's Complaint and the Black Elk TRO

8.      On October 26, 2016, the Trustee commenced this adversary proceeding by filing a complaint (the "Black Elk Complaint") alleging that PPCO, PPLO, and two members of the

Platinum hedge fund family now in liquidation under the supervision of the Grand Court of the Cayman Islands[2] had engaged in a scheme to defraud Black Elk in violation of the federal Bankruptcy Code and the Texas Uniform Fraudulent Transfer Act (Docket No. 1).[3]  The Black Elk Complaint seeks to recover an alleged fraudulent transfer of close to $100 million in cash. Of that amount, $24,600,584.31 was allegedly transferred to PPCO and $5 million was allegedly transferred to PPLO.  (As discussed below, those sums were transferred out of PPCO and PPLO the same day.)

9.      The Trustee concurrently filed an Emergency Application for Injunctive Relief (the "Application") seeking a temporary restraining order followed by a preliminary injunction regarding assets held by the defendants (Docket No. 2).  The Application emphasized that the individuals who allegedly defrauded Black Elk still controlled the defendant entities, and the danger that those individuals would dispute the defendants' assets.  *See, e.g.*, Application at ¶¶ 5, 6, 82, 98, 103, 114, 119, 121.

10.      This Court entered the requested TRO on October 26, 2016, finding that the assets at issue might be "further dissipated" due to the Defendants' alleged "illegal financial maneuverings" (Docket No. 7).

11.      The Black Elk TRO bars any transfers or expenditures by PPCO that would bring its liquid assets below $24,600,584.31, the amount the Trustee claims was fraudulently transferred to PPCO, and bars PPLO from making any transfers or expenditures that would bring its liquid assets below $5 million, the amount the Trustee claims was fraudulently transferred to

---

[2]  The defendants in liquidation in the Cayman Islands are Platinum Partners Value Arbitrage Fund LP ("PPVAF") and PPVA Black Elk (Equity) LLC ("PPVA BE").

[3]  The Trustee filed a similar complaint against Mark Nordlicht, David Levy, Daniel Small, Samuel Salfati, Jeff Shulse, Steven Fuerst, Anna Marizza Piche, and John P. Boylan in the district court of Harris County, Texas, 129th Judicial District, Cause No. 2016-76291. The case has been removed to C.A.16-cv-03614 in the United States Federal Court for the Southern District of Texas, Hon. Lee Rosenthal, presiding.

PPLO.  At the time the Black Elk TRO was entered, PPLO had no liquid assets.  PPCO had cash of approximately $133,000.  Thus, the effect of the Black Elk TRO was to prevent PPCO and PPLO from spending any cash they had at the time, or that subsequently came into their possession.

12.     On October 27, 2016, the Court modified the Black Elk TRO to permit payment of certain payroll expenses (Docket No. 8).  The Court allowed other amounts to be paid if the Trustee or his counsel authorized the payments by email, or upon application to the Court (Docket No. 8 ¶ 4).  Thereafter, the parties agreed to extend the Black Elk TRO by a number of agreed orders.  The last such agreed order was entered December 14, 2016 (Docket No. 75).

**PPCO and PPLO's Need to Make Payments, and Their Submission of Expense Requests to the Trustee's Counsel**

13.     PPCO is a master fund, and has a number of different types of assets in its portfolio of investments, including operating entities, investments in ongoing litigations via litigation funding arrangements, and a portfolio of life insurance policies, among many others. These assets in many cases need the infusion of capital to maintain their value. To give two examples:

  a.  PPCO has a subsidiary called Hamilton Capital XII LLC ("Hamilton") which engages in litigation funding.  Hamilton has ongoing obligations to fund litigations pursuant to contracts, and expects that some of those investments will eventually produce substantial value.  However, if Hamilton does not fulfill its obligation to pay for counsel under those funding arrangements, it risks defaulting and losing the upside of these investments.

D/959885v1

b.  PPCO has an interest in a portfolio of life insurance policies.  To recover on those policies when the insured dies, it is necessary to timely pay the premiums.

14.    Because of these and other investments, PPCO and PPLO needed to make a variety of expenditures after the entry of the Black Elk TRO, and submitted requests to the Trustee's counsel for approval.  Most of these requests were approved by the Trustee after back and forth with his counsel, who often requested more information or supporting documentation.

15.    On December 15, 2016, Platinum representatives met with the Trustee's counsel to discuss how PPCO might provide security to the Trustee. On December 16, 2016, counsel for the Trustee sent an email to PPCO and PPLO's counsel outlining "a proposal of security to substitute for the cash retention obligations of $29,600,584.31 the Court imposed on PPCO/PPLO in its Temporary Restraining Order."  The proposed settlement involved using $3 million in cash and the proceeds of the life insurance policies indirectly owned by PPCO to create a $29,600,584.31 escrow fund to secure the Trustee's litigation claim.

**The Indictment, SEC Complaint, and the Appointment of a Receiver**

16.    Three days later, circumstances changed dramatically.

17.    On December 19, 2016, the U.S. Attorney for the Eastern District of New York unsealed an eight-count indictment against seven individuals affiliated with Platinum (the "Indictment").  The Indictment alleges that the defendants defrauded Platinum investors through, among other things, the overvaluation of assets, the concealment of severe cash flow problems, and the preferential payment of redemptions.  The Indictment also charges four of the defendants with defrauding the independent bondholders of Black Elk, based on allegations similar to those in the Trustee's Complaint.

18.     That same day, the SEC filed a complaint (the "SEC Complaint") against the same seven individuals, Platinum Management (NY) LLC, and Platinum Credit Management, L.P. based on conduct similar to that alleged in the Indictment, including the alleged fraud on the Black Elk bondholders.  The SEC moved by order to show cause for a temporary restraining order (the "Platinum TRO") and the appointment of a receiver (the "Receiver Order").  On December 19, 2016, Judge Matsumoto entered the Platinum TRO and Receiver Order pursuant to which Bart M. Schwartz was appointed Receiver of PPCO; Platinum Credit Management, L.P.; Platinum Partners Credit Opportunities Fund (TE) LLC; Platinum Partners Credit Opportunities Fund LLC; Platinum Partners Credit Opportunity Fund (BL) LLC; Platinum Liquid Opportunity Management (NY) LLC; and Platinum Partners Liquid Opportunity Fund (USA) L.P., defined in the Receiver Order as the "Receivership Entities."

**The Receiver**

19.     The Receiver is a prominent member of the New York bar who served, among other positions, as the Chief of the Criminal Division in the United States Attorney's Office for the Southern District of New York. As the receiver of the Madoff-related Merkin hedge funds, he made investment decisions, managed litigation and investor relations, and ultimately obtained a successful settlement on behalf of the funds.  The U.S. Department of Justice appointed Mr. Schwartz to oversee General Motors' compliance with its deferred prosecution agreement stemming from its recall of defective ignition switches.  Following the arrest of Platinum co-founder Murray Huberfeld in June 2016, Mr. Schwartz was engaged as an independent oversight advisor for Platinum, in which capacity he acted as liaison with the SEC, among other things.[4]

---

[4] Mr. Schwartz's powers as independent oversight advisor were quite limited, and he did not have the power or the access to the funds' accounts that he acquired upon his appointment as Receiver.  Further, his work was forward-looking; he did not investigate past transactions or do any forensic accounting work.

**The Terms of the Receiver Order**

20.     The Receiver Order is meant to allow the Receiver to marshal and preserve all the assets of the Receivership Entities. Receiver Order at 1.  To that end, the Receiver Order empowers the Receiver to (among other things) take custody, control and possession of all Receivership Property (Receiver Order at 3 ¶ 6(B)), manage, control, operate and maintain the Receivership Entities (Receiver Order at 4 ¶ 6(C)), use Receivership Property for the benefit of the Receivership Estate, including payments and disbursements and incurring expenses as may be necessary (Receiver Order at 4 ¶ 6(D)), engage and employ persons needed to assist the Receiver in carrying out his  responsibilities (Receiver Order at 4 ¶ 6(F)), take such action necessary to preserve the Receivership Property (Receiver Order at 4 ¶ 6(G)), including bringing lawsuits (Receiver Order at 4 ¶ 6(J)), and investigate transactions by and among Receivership Entities and others (Receiver Order at 4 ¶ 6(I)), including hiring forensic experts (Receiver Order at 4 ¶ 6(F)).  The Receiver Order permits the Receiver to transfer, compromise or otherwise dispose of any Receivership Property (other than real estate) on terms the Receiver deems most beneficial to the Receivership Estate with due regard to the true value of the Property. Receiver Order at 12 ¶ 28.  The Receiver is also authorized to take all actions to manage, maintain and wind down the business operations of the Receivership Entities, including making legally required payments to creditors, employees and agents of the Receivership Estate. Receiver Order at 12 ¶ 31.  The Receiver is authorized to retain persons to assist him ("Retained Personnel"), subject to court approval.  Receiver Order at 17 ¶¶ 48-50.

21.     The Receiver Order forbids any person who has possession, custody or control of assets belonging to the Receivership Entities from transferring those assets. Receiver Order at 5-6 ¶ 10.  It further provides that no such person shall exercise any form of set-off or lien or form of self-help whatsoever, or refuse to transfer Receivership Property to the Receiver. *Id*. The

Receiver Order enjoins any person with notice of the Receiver Order from:  (a) interfering with the Receiver's efforts to take control of Receivership Property; (b) hindering, obstructing, or otherwise interfering with the Receiver's performance of his duties; (c) dissipating or otherwise diminishing the value of Receivership Property; or (d) otherwise interfering with the Receiver's efforts.  Receiver Order at 9-10 ¶ 23.

22.     The Receiver Order contains a stay of civil litigation, called "Ancillary Proceedings."  *See* Receiver Order at 11-12 ¶¶ 25-27.  With the exception of the matters carved out from the stay, the stay enjoins all civil proceedings involving Receivership Property or the Receivership Entities (among other things), including bankruptcy proceedings.  Receiver Order at 11 ¶ 25.  However, ¶ 25 of the Receiver Order contains a handwritten addendum that carves out "pending bankruptcy cases in which the Receivership Entities are involved" from the stay.[5] Because the addendum contradicts the definition of an "Ancillary Proceeding," and is at odds with the injunction against interference with the Receiver contained in Section VI of the Receiver Order, there is some confusion as to the impact of the Receiver Order on this case.  The Receiver has therefore respected the Black Elk TRO and sought relief in the U.S. District Court for the Eastern District of New York. *See generally*, ¶¶ 31-36 *infra*.  If not for the handwritten changes to the SEC's original proposed order—which were never intended to permit the Trustee to have veto power over the Receiver's operations—a standard stay of Ancillary Proceedings, including this action, would be in place.

---

[5]  The handwritten addendum was added by SEC attorney Neal Jacobson at the suggestion of Jeffrey Brown of Dechert LLP, who was acting as counsel for the defendants who were the subject of the Platinum TRO.  Mr. Brown was generally aware that certain entities might have interests that they needed to protect in bankruptcy cases and therefore requested the handwritten addendum in the belief that it would advance the interests of the Receivership Entities.  Mr. Jacobson intends to be present at Thursday's hearing.

**The Receiver's Acts to Protect Receivership Property Following His Appointment**

23.    Following his appointment, the Receiver immediately took steps to protect Receivership Property.  He fired those Platinum individuals who had been indicted, and removed them from Platinum's offices.  He determined where the Receivership Entities had bank accounts and other assets and took steps to prevent anyone other than the Receiver and persons acting at his direction from accessing those accounts or interfering with that property.

24.    He also reviewed the business activities of the portfolio companies, and determined what matters needed immediate attention.  Notably, when the Receiver took over he was confronted with a number of expenditures that urgently needed to be made to preserve Receivership Property, and which had not yet been approved by the Trustee's counsel.  For example, over $300,000 in premiums on life insurance policies were coming due; a law firm needed to be paid $600,000 to maintain Hamilton's interest in a patent litigation funding arrangement; a $75,000 retainer for counsel to represent PPLO in the NorthStar bankruptcy case was urgently required; and $55,000 in legal fees needed to be paid to counsel in a state court case to lift a lien on $1.3 million worth of equipment in which a Receivership Entity has an interest.

**The Trustee's Failure to Approve Expenses After the Appointment of the Receiver**

25.    Given the Black Elk TRO and the ambiguity in the Receiver Order, the Receiver continued PPCO and PPLO's practice of not making expenditures without the Trustee's approval so as to remain in compliance with the Black Elk TRO.[6]  That arrangement quickly proved untenable.

26.    On December 21, 2016, two days after the appointment of the Receiver, counsel for PPCO and PPLO reminded the Trustee's counsel that there were time-sensitive expenditures

---

[6]  Counsel for PPCO and PPLO gave the Trustee's counsel notice of the Receiver's appointment on December 20, 2016.

D/959885v1

requested by PPCO and PPLO, which the Receiver had approved, that had not been approved by the Trustee.   Counsel responded by saying that the Trustee had approved some of the expenditures, but had questions about others.

27.     On December 22, 2016, a Platinum employee provided information requested by the Trustee with respect to a proposed expenditure relating to a patent litigation funding arrangement.  The Trustee's counsel responded in an email that was sent to the Receiver and others that:

> At this point, the Trustee's problem is larger than payments on investments in [the patent litigation] or on the [litigation] settlement.  PPCO/PPLO makes these and other requests to spend money against the backdrop that so far PPCO/PPLO has not set aside _one penny_ in escrow – has not even offered to set aside any money from any of its multi-million dollar liquidity events – to satisfy the Bankruptcy's Court's TRO or the Black Elk creditors.

28.     On December 28, counsel for PPCO and PPLO provided the Trustee's counsel with information with respect to a transaction that the Trustee had approved subject to the provision of documents.  The Trustee's counsel responded:  "At this point, the Trustee does not feel comfortable acting on and will not act on this or other requests without first conferring with the Receiver(s) regarding the path and their role going forward."

29.     On December 30, counsel for PPCO and PPLO asked the Trustee to approve payment of a $23,568.88 premium needed to preserve value of a life insurance policy due January 4 and a quarterly interest payment due on a secured bank loan due January 2.  The Trustee had approved similar payments in the past.  On the morning of January 4, after much prodding by PPCO/PPLO counsel, counsel for the Trustee advised that the Trustee approved payment of the life insurance premium.  The interest payment was not approved.

30.     On the afternoon of January 4, the Receiver, the Receiver's proposed counsel (Cooley LLP), counsel for PPCO and PPLO, and others spoke to counsel for the Trustee over the

telephone.  The Trustee himself was not on the call.  In that call, counsel for the Trustee stated that the Trustee wanted to obtain security for the litigation claim asserted in the Black Elk Complaint, and that going forward the Trustee would not be approving *any* payments other than payments of premiums for life insurance policies (part of the security package proposed by the Trustee's counsel in the December 16 email).

**The Joint Application by the SEC and the Receiver in the U.S. District Court for the Eastern District of New York**

31.     As a result of the January 4 telephone call and the emails leading up to it, the Receiver believed that his receivership was at a stalemate, and that property belonging to the Receivership Estate would be forfeited because the Receiver had not been able to obtain the Trustee's agreement to let him make payments necessary to preserve Receivership Property.  In consultation with the SEC, the Receiver decided that the appropriate forum to seek relief was the U.S. District Court for the Eastern District of New York – the court that had appointed him.

32.     Accordingly, on January 9, 2017, the SEC and the Receiver filed a Joint Emergency Motion for an Order to Show Cause and Temporary Restraining Order (the "EDNY TRO Application").[7]  The EDNY TRO Application sought a temporary restraining order temporarily staying the instant Black Elk adversary proceeding, temporarily enjoining enforcement of the Black Elk TRO, and authorizing the Receiver to make approximately $3.15 million in urgently needed expenditures.  The Receiver enclosed a list enumerating these expenditures, of which approximately $1.16 million had been previously submitted to the Trustee for approval.  As the case filed by the SEC had been transferred from Judge Matsumoto to Chief Judge Irizarry, the application was made to Chief Judge Irizarry.

---

[7]  The SEC gave Mr. Smyser notice of the planned filing by email at 1:57 p.m.  The EDNY TRO was filed at 4:16 p.m., and copies of those papers were emailed to Mr. Smyser at 4:26 p.m.

D/959885v1

33.     On January 10, 2017, the Trustee's counsel wrote to Chief Judge Irizarry asking that the relief sought by the SEC and the Receiver (including the Receiver's requests to make the interest payment and other time-sensitive payments) be denied until the Trustee could be heard on the merits.  On January 11, 2017, Chief Judge Irizarry directed that the Trustee and the named defendants in the Eastern District of New York respond to the EDNY TRO Application by January 17, with reply papers due January 24, and scheduled a hearing on the Order to Show Cause on January 31 at 11:00 a.m.

34.     On January 11, 2017, the Trustee reversed his position.  That morning, counsel for the Trustee called the Receiver's counsel in New York and advised that the Trustee did not want to interfere with the Receiver's ability to carry out his responsibilities, and would likely agree to approve all the expenditures sought by the Receiver in the EDNY TRO Application. The Trustee's counsel asked the Receiver's counsel to send an email memorializing the call. Counsel did so, and received an email that afternoon confirming that the Trustee had approved *all* the payments outlined by the Receiver in the EDNY TRO Application.

35.     In that January 11 telephone call, the Receiver's counsel advised the Trustee's counsel that the Receiver could not provide security to the Trustee consistent with his obligation to treat similarly situated creditors similarly, and also to file a proposed Liquidation Plan and obtain Chief Judge Irizarry's approval before distributing Receivership Property.  Counsel for the Receiver reiterated that position in a subsequent telephone conversation with counsel for the Trustee in which the SEC participated.

36.     While the Trustee's January 11 email mooted the portion of the EDNY TRO Application seeking to make certain specified payments, the issue of the Receiver's ability to make payments out of Receivership Property was not resolved.  The Receiver needs to make

payments for rent, salaries, utilities, portfolio management, valuation experts, regular and forensic accountants, lawyers and the like, on a regular basis. The Receiver also needs to make payments to maintain the value of PPCO and PPLO investments. The issue of whether this adversary proceeding and other bankruptcy proceedings should be stayed was also not resolved. Those issues will be heard by Judge Irizarry on January 31, 2017.[8]

**The Receivership Entities' Cash Position**

37.     As discussed above, the Receivership Entities have very little cash. Indeed, the scheme outlined in the Indictment and the SEC Complaint was driven by a liquidity crisis that the Platinum funds were facing as a result of redemption requests that they had received and could not fulfill. Not surprisingly, the transfers that are the subject of the Black Elk Complaint – an alleged $24,600,584.31 transfer to PPCO on August 20, 2014 and an alleged $5 million transfer to PPLO on August 21, 2014 (Application at ¶ 119(d)-(e)) – did not remain with PPCO and PPLO. On August 21, 2014, those funds were transferred to Platinum Partners Black Elk Opportunities Fund LLC ("PPBE Onshore") and Platinum Partners Black Elk Opportunities Fund International Ltd. ("PPBE Offshore"), neither of which is a Receivership Entity.

38.     When the Receiver was appointed, the Receivership Entities had just under $4 million in cash. Almost all of that cash came from a $6,270,000 payment received by Hamilton on December 2, 2016. As of the EDNY TRO Application, the Receivership Entities had almost $13 million in cash. Almost all of that cash came from the December 2, 2016 payment to Hamilton, and a payment made to Hamilton on December 21, 2016.

39.     Now that the Receiver has taken control of the Receivership Entities, the cash that comes into PPCO and PPLO is being used to carry out the Receivership and maintain the value

---

[8]  On January 19, 2017, the Trustee submitted papers in opposition to the EDNY TRO Application in which he argued that (a) the U.S. District Court for the Eastern District of New York does not have jurisdiction over funds fraudulently transferred from Black Elk, and (b) that Trust will be injured if this adversary proceeding is stayed.

D/959885v1

of Receivership Property.  The Receiver expects that he will obtain additional cash in the near future as a result of payouts on investments made by PPCO and PPLO, or from selling certain Receivership Property.  After consultation with the SEC, and with Court approval where required, the Receiver intends to use those funds to maintain those investments that the Receiver determines in accordance with his statutory duties will generate funds and value that can be used to pay injured parties.  For example, PPCO has potentially significant investments in natural resources that do not currently produce cash flow but that could if properly managed and the necessary expenditures were made.

## ARGUMENT

40.     Under *Janvey v. Alguire*, 647 F.3d 585 (5th Cir. 2011), the Black Elk Trustee has the burden of establishing four elements in order to obtain a preliminary injunction:  (1) a substantial likelihood that the movant will prevail on the merits; (2) a substantial threat that the movant will suffer irreparable injury if the injunction is not granted; (3) that the threatened injury to the movant outweighs the threatened harm an injunction may cause the party opposing the injunction; and (4) that the granting of the injunction will not disserve the public interest.  *Id.* at 595.

41.     The Receiver acknowledges that the allegations in the Black Elk Complaint concerning the fraud allegedly perpetrated by Platinum principals on innocent Black Elk noteholders are similar to allegations in the Indictment and the SEC Complaint, and has informed the Trustee that he will not contest the Trustee's ability to prove the element of likelihood of success on the merits.  The Receiver's stipulation does not mean that a preliminary injunction should be granted.  A preliminary injunction is an "extraordinary remedy never awarded as of right."  *Winter v. Natural Res. Defense Council*, 555 U.S. 7, 24 (2008).  Courts must balance competing claims of injury and pay particular regard to the public consequences of

D/959885v1

issuing an injunction. *Id.* Likelihood of success on the merits alone, without a clear showing of irreparable harm, does not entitle the movant to a preliminary injunction. *See Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985); *see also Bluefield Water Ass'n, Inc. v. City of Starkville, Miss.*, 577 F.3d 250, 253 (5th Cir. 2009) (denying preliminary injunction where there is no irreparable injury).

42.     Here, not only would the public interest be disserved by allowing a single unsecured creditor to prevent the orderly administration of entities that owe hundreds of millions of dollars to other defrauded creditors and investors, but the threat of irreparable injury has been eliminated entirely by the appointment of a Receiver. A preliminary injunction would do nothing to protect the assets from dissipation, but would disserve the public interest by hindering the Receiver in performing his duties and frustrating the Receivership's goal of equality of treatment of similarly-situated parties.

## I.      THE TRUSTEE CANNOT DEMONSTRATE IRREPARABLE INJURY

### A.      The Receivership Protects the Assets from Dissipation

43.     The Trustee's Application for preliminary injunctive relief focused on the danger that Platinum management would dissipate the defendants' assets (*see* App. ¶¶ 114-115), and repeatedly cited cases that emphasized the risk of dissipation of assets in granting freeze orders.[9] When this Court issued the Black Elk TRO, it found a risk of irreparable injury to the Trust

---

[9] *See*, *e.g.*, *A.T.N. Indus., Inc. v. Gross*, 632 F. App'x 185, 191 (5th Cir. 2015) (enjoined party had "experience and sophistication in transferring money internationally" and there was "high risk that funds allegedly belonging to plaintiffs could disappear"); *Kalsi Eng'g, Inc. v. Davidson*, No. CV H-14-1405, 2014 WL 12540550, at *2 (S.D. Tex. Sept. 2, 2014) (funds were still in the possession of the enjoined party and there was "substantial threat that [the party would] irretrievably dissipate such funds and assets in the near future"); *In re Atlas Fin. Mortg., Inc.*, No. 13-32683-BJH-7, 2014 WL 172283, at *5 (Bankr. N.D. Tex. Jan. 14, 2014) (enjoined party "likely to transfer the Additional Properties without a sound business reason and without accounting for the proceeds in order to thwart the Trustee's attempts to have . . . assets made available to pay the Debtor's . . . creditors"); *In re Focus Media Inc.*, 387 F.3d 1077, 1086 (9th Cir. 2004) ("There is also evidence in the record that in the past [the enjoined party] made away with Focus Media funds, suggesting that he may do the same with respect to the funds that [Plaintiff] seeks to recover."); *USACO Coal Co. v. Carbomin Energy, Inc.*, 689 F.2d 94, 98 (6th Cir. 1982) (enjoined party "could 'easily dispose' of the defendants' holdings and could transfer any proceeds to foreign enterprises").

"based on the alleged illegal financial maneuverings" of the purported fraudsters, who at that time still controlled the defendant entities. *See* Black Elk TRO at 3.

44.     The Receiver's appointment eliminated that risk by removing control of  PPCO and PPLO from the alleged wrongdoers.[10]  The Receiver is tasked with, *inter alia*, "marshaling and preserving all assets . . . preserv[ing] the status quo, . . . prevent[ing] further dissipation of the property and assets of the Receivership Entities;" and "prevent[ing] the encumbrance or disposal of property or assets of the Receivership Entities."  Receiver Order at 1-2.  While there was reason to be concerned about dissipation of assets when PPCO and PPLO were run by the individuals who allegedly master-minded the fraud on Black Elk, those individuals have since been indicted and the Receiver has terminated their employment.

45.     Once the Receiver took control of PPCO and PPLO, the risk of dissipation on which the Trustee's Application and the Black Elk TRO were premised ceased to exist.  A preliminary injunction is unnecessary because the Receivership will fully protect the disputed funds from dissipation pending a final equitable resolution of all creditors' claims, including Black Elk's.

**B.     The Receiver is Marshalling Assets to Ensure Maximum Possible Repayment**

46.     Pursuant to his mandate, the Receiver has begun to determine what assets the Receivership Entities have, establish a process to determine their value, sort the wheat from the chaff, and figure out how best to maximize the good investments for the benefit of *all* creditors

---

[10]  The SEC has the right to seek, and the district court has the power to grant, broad equitable relief in securities fraud actions to preserve assets from dissipation.  That power includes the power to appoint a receiver and to stay litigation that interferes with the receivership.  *See, e.g.*, *S.E.C v. Wencke*, 783 F.2d 829, 837 n.9 (9th Cir. 1986); *Rishmague v. Winter*, 616 F. App'x 138, 139-40 (5th Cir. 2015); *S.E.C. v. Stanford Int'l Bank Ltd.*, 424 F. App'x 338, 340 (5th Cir. 2011).  Thus, the district court may stay (or prevent the commencement of) a bankruptcy case. *See, e.g.*, *S.E.C. v. Byers*, 592 F. Supp. 2d 532, 536 (S.D.N.Y. 2008), *aff'd*, 609 F.3d 87 (2d Cir. 2010); *Schauss v. Metals Depository Corp.*, 757 F.2d 649, 654 (5th Cir. 1985); *Stanford Int'l Bank*, 424 Fed. App'x at 340.  As discussed above, there is a pending application before Chief Judge Irizarry in the Eastern District of New York to clarify the Receiver Order, and to stay bankruptcy proceedings.

and *all* investors.  Notably, the Platinum fraud is *not* alleged to have been a traditional Ponzi scheme.  While it may have turned into one as Platinum's managers struggled to deal with the liquidity crisis that engulfed them from 2012 onward, the Platinum funds had real assets under management.  In particular, PPCO's portfolio contains a number of investments that are believed to have the potential to produce substantial value, if properly managed.  Because at least some of the Receivership Entities have *bona fide* assets, the Receiver expects to be able to satisfy an appreciable portion of the Receivership Entities' creditor and investor losses.

47.     Although the Receiver has devoted much time and effort to attempting to untangle the Receivership Entities' affairs since his appointment, there is a great deal that remains to be done.  Of particular importance, he has not yet been able to independently value the Receivership Entities' assets, engage in forensic accounting work, or investigate potential claims against Platinum's managers, other members of the Platinum fund family, and third parties.

48.     Once the Receiver completes his initial investigation, he will move forward with developing a Liquidation Plan for the equitable distribution and satisfaction of creditor and investor claims, working under the guidance of the SEC.  The Liquidation Plan formulated by the Receiver will be subject to the approval of Chief Judge Irizarry.  Creditors and investors who disagree with the Plan will be afforded the opportunity to be heard and voice their objections. *See S.E.C. v. Sharp Capital, Inc.*, 315 F.3d 541, 545 (5th Cir. 2003) (noting the "proper procedure" in summary proceedings distributing receivership assets includes permitting parties to present evidence (citing *S.E.C. v. Elliott*, 953 F.2d 1560, 1567 (11th Cir. 1992)), and voice objections (citing *S.E.C. v. Basic Energy & Affiliated Res.,* 273 F.3d 657, 668 (6th Cir. 2001))).  Thus, to the extent the Trustee believes that the Trust is entitled to preferred treatment or

otherwise disagrees with the Liquidation Plan, he will be able to take those issues up with Chief Judge Irizarry.

### C. The Trustee's Desire to Improve Its Position at the Expense of Other Creditors Does Not Constitute Irreparable Injury

49.     Now that there is a court-appointed Receiver, the only possible argument that remains for the Trustee is that the Trust will be deprived of a remedy if a preliminary injunction does not issue.  App. ¶¶ 114-115.  However, that argument is without merit because the freeze order sought by the Trustee does not apply to "the property in dispute *or its direct, traceable proceeds*."  *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011) (emphasis added); *see also Matter of Southmark Corp.*, 49 F.3d 1111, 1116 (5th Cir. 1995) (no equitable property interest in commingled funds).

50.     While the Trustee may be able to establish an equitable *claim* to damages in the amount transferred to PPCO and PPLO, he cannot establish equitable *title* to any of PPCO or PPLO's funds and impose a constructive trust on them for the Trust's benefit without first proving that the funds in question are the same funds that were transferred by Black Elk.  *See United States v. Durham*, 86 F.3d 70, 73 (5th Cir. 1996) (constructive trust or equitable lien requires tracing the assets; when tracing is impossible, "claimant has merely a personal claim against the wrongdoer and the funds are distributed ratably"); *Matter of Southmark*, 49 F.3d at 1117-18 (equitable claim to property in an estate does not constitute equitable title to that property).

51.     The Trustee cannot carry his burden of proving that the assets he seeks to freeze – amounting to approximately triple the Receivership's current cash on hand – are directly traceable to the alleged Black Elk scheme.  *Matter of Haber Oil Co., Inc.,* 12 F.3d 426, 436 (5th Cir. 1994) ("The burden of establishing the existence of the constructive trust rests on the

19

claimant, as does the burden of identifying or tracing the trust property."); *In re Emerald Oil Co.*, 807 F.2d 1234, 1238 (5th Cir. 1987) ("To profit from § 541(d), a party must demonstrate that state law impresses property that the debtor holds with an equitable interest in his favor that attached prior to bankruptcy.").[11]   On the contrary, as documents previously produced to the Trustee show, the two transfers in question left the accounts to which they had been made within a day of the transfer from Black Elk, and were transferred to Platinum Partners Black Elk Opportunities Fund LLC ("PPBE Onshore") and Platinum Partners Black Elk Opportunities Fund International Ltd.  ("PPBE Offshore")  Neither PPBE Onshore nor PPBE Offshore is a Receivership Entity.

52.    Even if the Trustee could trace the proceeds of the alleged Black Elk fraud to PPCO and PPLO, a constructive trust should not be imposed since it would unfairly enhance the Trustee's position vis-à-vis other creditors.  *See Rosenberg v. Collins*, 624 F.2d 659, 663 (5th Cir. 1980) (under Texas law, a constructive trust is implemented only "where equity and justice demand"); *see also Matter of Haber Oil Co.*, 12 F.3d at 436 (noting bankruptcy courts' reluctance to impose constructive trusts without a substantial reason because it gives unsecured claimants priority over the defendant's other unsecured creditors).  When all claimants stand on equal footing, the ability to trace certain funds "is the result of the merely fortuitous fact that the defrauders spent the money of other victims first," and it should not be a basis to elevate one creditor over another.  *Durham*, 86 F.3d at 72; *see also S.E.C. v. Forex Asset Mgmt. LLC*, 242 F.3d 325, 332 (5th Cir. 2001) (despite claimants' ability to trace funds, "the facts did not support a remedy that would elevate [their] claim above the other victims").

---

[11] As the alleged purpose of the Black Elk scheme was to pay redemptions, it is unlikely the money returned to PPCO or PPLO after its transfer to the PPBE entities. *See* SEC Complaint ¶ 72.

D/959885v1

53.     The Trustee's attempt to freeze PPCO and PPLO's operating cash – most if not all of which is due to returns from Hamilton or will be due to future returns on investments unrelated to Black Elk – can only be understood as an attempt to convert an unsecured claim into a secured one. *See Matter of Haber Oil Co.*, 12 F.3d at 436 (noting the temptation for unsecured creditors to argue that their unsecured claims are eligible for the remedy of a constructive trust to gain priority over other unsecured creditors). There is no basis in law or equity for such an injunction here. It is axiomatic that "all similarly-situated creditors [be] treated fairly." *Matter of S.I. Acquisition, Inc.*, 817 F.2d 1142, 1153 (5th Cir. 1987) (staying action against debtor because if creditor were allowed to proceed "it would collect its claim from a pool of assets that should be available to all creditors"); *see also Durham,* 86 F.3d at 72-73 (fraud victims in equal positions should be treated as such).[12]

## II.    PPCO AND PPLO INVESTORS AND CREDITORS – INCLUDING THE TRUST – WILL SUFFER IRREPARABLE HARM IF A PRELIMINARY INJUNCTION IS ENTERED INTERFERING WITH THE RECEIVER'S ABILITY TO MARSHAL AND PRESERVE THE ASSETS AT ISSUE.

54.     Even at the time of the Black Elk TRO, when PPCO and PPLO were still under the control of the alleged perpetrators of the fraud, this Court found a "substantial probability of injury" to the defendants and found the balance of injuries in equilibrium. Black Elk TRO at 3 ¶ 4. While the risk of injury to the Trust has been eliminated as a result of the Receiver's appointment, the risk of injury to defendants PPCO and PPLO from a preliminary injunction remains at least as potent now as it was in October. If anything, the risk of harm is even greater

---

[12]  The Trustee is contending in the Eastern District of New York that the district court does not have jurisdiction over PPCO and PPLO's assets because they are property of the bankruptcy estate. As discussed above, the factual basis for that argument is incorrect. There is no evidence that the assets in the Receiver's possession are traceable to the $29.6 million allegedly fraudulently transferred to PPCO and PPLO. In any event, whether the funds at issue are property of the estate is entirely irrelevant to this motion. The fact that property is property of the estate does not create a presumption of prejudgment attachment or right to freeze those assets in the absence of otherwise irreparable harm. *See Matter of Southmark Corp.*, 49 F.3d 1111, 1116 (5th Cir. 1995).

given the flexibility the Receiver needs to efficiently maximize the value of Receivership Property for all creditors and investors. *See Rishmague v. Winter*, 616 F. App'x 138, 140 (5th Cir. 2015) (recognizing the Receiver's interests in marshaling and conserving the estate, particularly in the early stages of a receivership); *accord S.E.C. v. Stanford Int'l Bank Ltd.*, 424 F. App'x 338, 342 (5th Cir. 2011).

A.   **The Receiver, and the Innocent Parties the Receiver was Appointed to Protect, Will Be Irreparably Injured if the Receiver Is Not Permitted to Use PPCO and PPLO's Liquid Assets to Preserve the Value of the Receivership Estate**

55.   The preliminary injunction sought by the Trustee would bar PPCO from transferring, spending, or otherwise reducing in any manner its funds on deposit at any institution or location in the world if, after giving effect to such transfer, the total unencumbered funds held by PPCO are less than $24,600,584.31.   It would bar PPLO from transferring, spending, or otherwise reducing in any manner its funds on deposit at any institution or location in the world if, after giving effect to such transfer, the total unencumbered funds held by PPLO is less than $5 million.   Because PPCO and PPLO do not have liquid assets that come close to $29.6 million, the effect of the preliminary injunction would be to prevent these Receivership Entities from spending any money at all and prevent the Receiver from fulfilling his court-ordered duties as Receiver.

56.   PPCO has significant assets but they are not liquid. A preliminary injunction freezing PPCO's liquid assets would prevent the Receiver from maximizing the value of PPCO's illiquid assets.   Indeed, it would cause the Receiver to default on obligations (*e.g.*, the obligation to pay life insurance premiums on life insurance policy investments, and legal fees on litigation funding investments) thus reducing the value of PPCO's assets to the detriment of all creditors. It will prevent the Receiver from making expenditures to protect the value of other PPCO assets

D/959885v1

(*e.g.*, certain natural resources companies) that could generate cash flow that would redound to the benefit of PPCO creditors and investors. Ironically, the preliminary injunction sought by the Trustee would actually harm the Trust as the Receiver would be precluded from maximizing the value of legitimate illiquid investments which have real value. Indeed, if the preliminary injunction were granted, the Receiver would have to seriously consider putting PPCO into bankruptcy (see Receiver Order at 2, 13-14).[13]

> **B.    A Preliminary Injunction Requiring the Receiver to Obtain the Approval of the Trustee or this Court to Expend Receivership Assets Serves No Purpose and Will Injure the Receiver, and the Innocent Parties He Was Appointed to Protect.**

57.    No purpose would be served by continuing the somewhat less onerous TRO presently in effect as a preliminary injunction (assuming the Trustee seeks such relief). When PPCO and PPLO were being run by alleged fraudsters, requiring them to have their expenditures reviewed by the Trustee (or alternatively, by this Court) had a rational basis. But no purpose is served by reviewing expenditures that the Receiver has determined should be made as the Receiver is an officer of the court and is acting under the supervision of the SEC and a federal district judge. Adding another layer of approval impairs the ability of the Receiver to make time-sensitive decisions, deflects the attention of the Receiver and those working with him from other Receivership tasks, and imposes unnecessary legal fees on the Receivership Estate. It also provides unfair leverage to the Trustee. Indeed, the uncertainty surrounding whether the Trustee has approved a transaction and the need to obtain approvals (often requiring multiple discussions and submission of documents) has been a serious distraction for the Receivership Entities' staff,

---

[13]  The Application assumes that no harm would come to PPCO or PPLO because the freeze would simply "prohibit[] [Defendants] from closing their funds and disbursing fund assets to fund clients." App. ¶ 116. The Trustee did not explain how PPCO and PPLO could survive without cash, and of course did not consider the impact of the Receivership because it did not exist at the time.

which has been significantly reduced in size as a result of the Receiver's efforts.[14]   The assurances made by the Trustee's counsel on January 11 that the Trustee has no desire to interfere with the Receiver's financial decisions, which the Receiver appreciates, underscore the lack of need for any such approval process.

58.   Managing the affairs of the Receivership Entities is a complicated endeavor that requires the Receiver to make many decisions, often on a short time line.   A preliminary injunction of any sort would unnecessarily interfere with the Receiver's ability to do his job. The Receiver has been in place for only five weeks.   While the Receiver served as the independent oversight advisor for Platinum prior to his appointment, that position was advisory. The Receiver was not managing the Receivership Entities, and his mandate did not include tracing funds or doing forensic work.   Courts have repeatedly recognized the need for a receiver to have the freedom to act without interference, especially in the early stages of a receivership. *See Rishmague*, 616 F. App'x at 140 (interests of receivership asset recovery and administration can outweigh interests of parties wishing to lift litigation stays even after four years of receivership); *S.E.C. v. Stanford Int'l Bank Ltd.*, 424 F. App'x 338, 342 (5th Cir. 2011) (affirming denial of motion to modify stay where receivership was in its early stages and the receiver was continuing to marshal and conserve the estate); *S.E.C. v. Wencke*, 742 F.2d 1230, 1231 (9th Cir. 1984) (noting the importance of "the time in the course of the receivership at which the motion for relief from the stay is made").

---

[14]   Platinum once had more than 80 employees.  Currently, there are 13 Platinum employees all of whom now report to the Receiver.

D/959885v1

### III.   A PRELIMINARY INJUNCTION WOULD DISSERVE THE PUBLIC INTEREST BY FAVORING ONE CREDITOR OVER OTHERS.

59.     The Trustee currently has a $29.6 million unsecured contingent claim against PPCO and PPLO.  While it appears the Trust will ultimately be able to establish that Platinum principals engaged in fraud and that transfers were made to PPCO and PPLO as a result of that fraud, the Trust is but one unsecured claimant among many.  The Receiver is presently aware of over $85.5 million in purported PPCO/PPLO secured and unsecured debt (not counting Black Elk, claims of employees and insiders or investors), and over $33 million in unpaid redemptions. The most recent unaudited NAVs calculated by Platinum management for PPCO and PPLO total approximately $543 million.[15]  The facts alleged in the Indictment and SEC Complaint indicate that many persons and entities were harmed by Platinum, and that the creditors represented by the Trust were not the only victims of Platinum.  *See, e.g.*, SEC Compl. ¶¶ 126 (alleging misrepresentations and "efforts to dissuade investors from redeeming"); 128 (alleging Nordlicht's omission of material information to investor, such as that the fund had been having trouble paying redemptions for more than one quarter and that one of its large portfolio company holdings was overvalued); 130 (alleging Landesman persuaded several investors to postpone their redemptions without disclosing PPVA's liquidity crisis.).

60.     In receiverships, as in bankruptcy, public policy weighs in favor of the orderly administration of assets via the estate. *In re OGA Charters, LLC*, 554 B.R. 415, 426 (Bankr. S.D. Tex. 2016) (citing *Janvey*, 647 F.3d at 600-01; *In re Lots by Murphy, Inc.*, 430 B.R. 431, 436 (Bankr. S.D. Tex. 2010)).  Where, as here, the Trustee's claim is but one of many against a receivership dismantling a massive organization replete with consequences of the individual

---

[15]  The Receiver has not yet determined the amount of cash invested by PPCO and PPLO investors.  That is one of the many projects he intends to undertake.

defendants' actions, the Trust cannot be allowed to skip to the front of the line simply because its claim was lodged first.  *Cf. S.E.C. v. Byers*, 592 F. Supp. 2d 532, 537 (S.D.N.Y. 2008), *aff'd*, 609 F.3d 87 (2d Cir. 2010) (comparing receiver's charge to protect the investments of all receivership entities' investors to debtors' being "only concerned with recouping their own investments, presumably even at the expense of other investors" and noting that the best way to maintain the status quo is to permit the receiver to carry on with his investigation).

61.     Additionally, in *Schauss v. Metals Depository Corp.*, 757 F.2d 649, 653-54 (5th Cir. 1985), the Fifth Circuit recognized that comity counsels in favor of federal courts being "careful to avoid hindering each other's proceedings," particularly in light of "the importance of preserving a receivership court's ability to issue orders preventing interference with its administration of the receivership property" in both securities fraud cases and bankruptcy proceedings.  *Id.* at 653-54 (citations omitted).

62.     These general concerns about allowing the Receiver to marshal the assets of the Receivership Estate coincide with the specific concern that the Trustee is attempting to use the Black Elk TRO to turn what would otherwise be an unsecured claim into a secured claim to obtain a priority in distribution to the detriment of other similarly situated victims.  As the alleged Black Elk fraud appears to have been just one part of the overall scheme alleged by the SEC to hide the liquidity crisis facing Platinum, allowing the Trustee to obtain security via the freeze order now being sought would adversely affect the Receivership Entities' other creditors and investors and give the Trust an unfair advantage.  *See* SEC Compl. at 22-31 ¶¶ 69-102.  The balance of harms therefore weighs against granting a preliminary injunction.

## **CONCLUSION**

63.    For these reasons, the Receiver asks the court to deny the Trustee's Application for Preliminary Injunctive Relief and lift the Temporary Restraining Order entered October 26, 2016 and extended December 14, 2016.

Dated:  January 24, 2017

[signature on next page]

D/959885v1

Respectfully submitted,


By: _/s/ T. Micah Dortch_____
    **T. MICAH DORTCH**
    State Bar No. 24044981
    SDTX Bar No. 630903

    **COOPER & SCULLY, P.C.**
    900 Jackson Street, Suite 100
    Dallas, Texas  75202
    Telephone:  (214) 712-9500
    Facsimile:  (214) 712-9540
    Micah.Dortch@cooperscully.com
    **ATTORNEY-IN-CHARGE FOR
    DEFENDANTS PLATINUM PARTNERS
    CREDIT OPPORTUNITIES MASTER FUND
    LP AND PLATINUM PARTNERS LIQUID
    OPPORTUNITIES MASTER FUND LP**


**OF COUNSEL**:

**COOPER & SCULLY, P.C.**

**CHRISTOPHER D. LINDSTROM**
State Bar No. 24032671
SDTX Bar No.:  33525
815 Walker, Suite 1040
Houston, Texas  77002
Telephone:  (713) 236-6800
Facsimile:  (713) 236-6880
Chris.Lindstrom@cooperscully.com


**COOLEY LLP**

Celia Goldwag Barenholtz (*admitted pro hac vice*)
1114 Avenue of the Americas
New York, NY 10036
(212) 479-6330
cbarenholtz@cooley.com
**PROPOSED COUNSEL TO RECEIVER**

D/959885v1

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct of the foregoing was served on counsel for all

counsel of record via the Court's ECF system on January 24, 2017.

_/s/ T. Micah Dortch_____

**T. MICAH DORTCH**

D/959885v1